Chamis **TAHAN**, Appellant,

v.

John G. **HODGSON**, Appellee.

No. 80–2095.

United States Court of Appeals, District of Columbia Circuit.

Argued 12 June 1981.

Decided 25 Aug. 1981.

Hershel Shanks, Washington, D.C., with whom Steven A. Standiford and Michael A. Gordon, Washington, D.C., were on the brief for appellant.

Frank J. Martell, Washington, D.C., for appellee.

Before McGOWAN, WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Plaintiff brings this action for enforcement of a default judgment entered against defendant by an Israeli court. The matter is before this court on cross motion for summary judgment, with the diversity jurisdiction of this court invoked. The district court found for the defendant; we reverse and remand for the district court to enforce the judgment.

## I. FACTUAL BACKGROUND

The essential facts in this case are straightforward and uncontroverted. Plaintiff Chamis Tahan operates a travel agency in Jerusalem which acted as agent for the travel agency of defendant Sir John G. Hodgson until a dispute arose and the relationship ended. Plaintiff claimed that defendant owed him a sum of money for past services, but defendant denied the debt. Mediation failed and plaintiff filed suit in Israel. Plaintiff's attorney served defendant personally in Jerusalem, but defendant refused to acknowledge service on the grounds that the papers were drawn in Hebrew, a language he did not read. Plaintiff's attorney later left the complaint with defendant, who subsequently returned the papers to the attorney's office, stating that he would submit the matter to his attorney and defend the claims once he had received a "complete translation and documentation in English."[1] Plaintiff then obtained a default judgment against defendant in the amount of $54,114.40 plus legal fees in the amount of $3,870.00. It is this default

---

1. Letter from John G. Hodgson to Yoav Levy (31 October 1979).

judgment in Israel which plaintiff now seeks to have enforced by the courts of the United States.

## II. LEGAL ISSUES

The seminal case in the area of enforcement of foreign judgments is *Hilton v. Guyot.*[2] *Hilton* found that "the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or on appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact" if

> there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after *due citation* or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect . . . .[3]

Thus, requirements for enforcement of a foreign judgment expressed in *Hilton* are that there be "due citation" and that the

original claim not violate American public policy,[4] that is, in the language of the *Restatement (Second) Conflict of Laws,* that it not be "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought."[5] *Hilton* also established the principle of "reciprocity," which requires a judgment rendered in a foreign nation to be subjected by the federal courts in this country to a reexamination on the merits if an American judgment would be given similar treatment in the foreign nation involved.[6]

It is not alleged that the Israeli court lacked competent jurisdiction, nor is the general integrity of the Israeli judicial system questioned, nor is it alleged that the judgment rendered in this case was fraudulent. Therefore, the legal issues raised in this case reduce to three. First, was there "due citation" of defendant? That is, was there effective service of process? Second, would enforcement of this default judgment be "repugnant to fundamental notions of what is decent and just" in the United States? And, third, what applicability does the doctrine of reciprocity have to this case?

We shall consider each of these issues in turn.

### A. *Effective Service of Process*[7]

In a default judgment, it is essential that there have been effective service of process.

---

**2.** 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895). *Hilton's* also-important but less-cited sister case was *Ritchie v. McMullen,* 159 U.S. 235, 16 S.Ct. 171, 40 L.Ed. 133 (1895) (Canadian judgment enforced).

**3.** 159 U.S. at 202, 203, 16 S.Ct. at 158, 159 (emphasis added).

**4.** *See also* H. Goodrich & E. Scoles, Conflict of Laws § 211 (1964). The origin of the doctrine in American federal law is in *DeBrimont v. Penniman,* 10 Blatch. 436, 7 Fed.Cas. No. 3715 (1873).

**5.** § 117, Comment c (1971). *See also* A. Ehrenzweig, A Treatise on the Conflict of Laws § 56 (1962), quoting H. Goodrich, Conflict of Laws § 211 (1949) ("repugnant to our notions of decency"); Reese, *The Status in This Country of Judgments Rendered Abroad,* 50 Colum. L.Rev. 783, 796–98 (1950).

**6.** As will be discussed later, it is doubtful whether the reciprocity doctrine is still viable. *See* pp. 867–868 *infra.*

**7.** This requirement has origins predating *Hilton. See Sawyer v. Maine Fire & Marine Ins. Co.,* 12 Mass. 291 (1815). *Accord: Bradstreet v. Neptune Ins. Co.,* 3 Fed.Cas. No. 1793, 3 Sumn. 600 (1839). It remains well-established. *See Griffin v. Griffin,* 327 U.S. 220, 66 S.Ct. 556, 90 L.Ed. 635 (1946); *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 443 (3d Cir. 1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972) ("The polestar is whether a reasonable method of notification is employed and reasonable opportunity to be heard is afforded to the person affected"). *Cf. McDonald v. Mabee,* 243 U.S. 90, 37 S.Ct. 343, 61 L.Ed. 608 (1917). *See also* Restatement (Second) Conflict of Laws § 92 (1971); A. Ehrenzweig, A Treatise on the Conflict of Laws § 55 (1962).

That requirement seems clearly to have been met here. While the effectiveness of some forms of process is debatable, personal service is almost always acceptable.[8]

Even if defendant were unable to read Hebrew, he should have surmised that the papers being served upon him were legal in nature, and that he could ignore them only at his peril. In fact, it is certain that he *was* cognizant of the fact that the papers served upon him were legal in nature. The parties had, after all, been involved in a heated legal dispute for several months, making charges and countercharges against one another and rendering accounts and counteraccounts. Defendant acknowledges in his brief that when he was served these legal papers in October 1979, the gentleman presenting him the papers "claim[ed] to be an attorney."[9] Further reflecting the official or legal nature of the papers were the facts that the attorney serving them, Mr. Levy, sought to have defendant affix his signature to them and that the papers themselves were printed forms. Defendant at the time requested Mr. Levy to meet with him instead at the United States Consulate, "where matters might be more appropriately handled."[10] Again, this request seems consistent only with a recognition of the legal nature of the dispute, of Mr. Levy's visit, and—therefore—of the papers Mr. Levy had given defendant. Prior to the default judgment, defendant sent a letter to the person who had presented himself as an attorney, addressed to Mr. Levy's "*Law* Office," and stating that "on receipt of complete translation and documentation in English sent to this address, they [the papers] will be turned over to our *attorneys* who, in turn, will respond to whatever *complaints* are detailed therein."[11] A letter a week earlier, similarly addressed to Mr. Levy's "*Law* Office," read that "as soon as we receive the necessary papers with English translations in Washington DC our *attorneys* will respond."[12] It is, moreover, inconsistent for defendant to claim, as he does on the one hand, that he had been denied effective service of process while on the other hand claiming that "[t]here can be no doubt that [defendant] Appellee had every intention to defend the Israeli action, and that such intention was conveyed to [plaintiff] Appellant."[13]

■ Therefore, we conclude that defendant had indeed received effective service of process. As a man who had done business in Israel for some years, he seems to have been singularly insensitive to the problem he faced by means of his having been personally served with process in Israel. He showed bad judgment in not putting the matter in the hands of an Israeli lawyer. It would be insulting were we to require that the Israeli legal machinery adapt itself by translating the official language of that country, Hebrew, into any defendant's language.[14]

---

**8.** *See* Restatement (Second) Conflict of Laws § 25 (1971).

**9.** Brief of Appellee at 5.

**10.** Affidavit of Defendant, 23 June 1980, ¶ 6.

**11.** Letter of John G. Hodgson to Yoav Levy (31 October 1979) (emphasis added).

**12.** Letter of John G. Hodgson to Yoav Levy (22 October 1979) (emphasis added).

**13.** Brief of Appellee at 14.

**14.** *See Commonwealth v. Olivo*, 369 Mass. 62, 337 N.E.2d 904 (1975). In *Olivo* the defendant's conviction for criminal violation of housing department orders was upheld even though defendant could not read the notice of violation, which was in English: "The nature of the defendants' . . . inability to read English, was not such as would render them incapable of understanding the need for further inquiry." *Id.* at 910. *See also Julen v. Larson*, 101 Cal. Rptr. 796, 798, 25 Cal.App.3d 325, 328 (1972) ("While we do not require documents in a foreign language to be translated into English to be validly served, we think at a minimum defendant should be informed in the language of the jurisdiction *in which he is served* . . ." (emphasis added)).

Note that the Federal Rules of Civil Procedure recognize service of process in a language other than English when a foreign jurisdiction is involved, particularly if such service is made "reasonably" or "personally":

Alternative Provisions for Service in a Foreign Country.

(1) Manner. When the federal or state law referred to in subdivision (e) of this rule authorizes service upon a party not an inhabitant of or found within the state in which the

## B. *Public Policy*

The district court's memorandum opinion [15] found for the defendant in the case at hand because, it reasoned, enforcement of the Israeli default judgment would violate American public policy in two ways. First, it would be inconsistent with Rule 55(b)(2) of the Federal Rules of Civil Procedure, which provides that under certain circumstances a so-called "second" notice must be given at least three days prior to hearing and application for entry of default. Second, insofar as the Israeli judgment was entered against defendant *personally* rather than upon defendant's *corporation*, it would violate American public policy against piercing the corporate veil in the absence of "compelling justification." [16] While these arguments are by no means unreasonable, we believe that plaintiff should prevail here in the enforcement of the Israeli judgment. We believe that for the reasons outlined below, American public policy will not be violated by enforcement of the Israeli judgment. [17]

■ With respect to the fact that Israeli procedure was inconsistent with Rule 55(b)(2) of the Federal Rules of Civil Procedure, we think that it would be a mistake to find failure to follow the Federal Rules by a foreign nation to be *ipso facto* a violation of American public policy. It would be unrealistic for the United States to require all foreign judicial systems to adhere to the Federal Rules of Civil Procedure. Obviously, all foreign judgments will be inconsistent to some extent with the Federal Rules; many state court judgments are, for that matter. Surely a more important discrepancy than this is necessary to create a violation of public policy. We do not find the Israeli court's failure to provide second notice three days prior to hearing an application for entry of default to be so "repugnant to fundamental notions of what is decent and just" that American public policy requires non-enforcement of the subsequent judgment. [18]

district court is held, and service is to be effected upon the party in a foreign country, it is also sufficient if service of the summons and complaint is made: (A) *in the manner prescribed by the law of the foreign country for service in that country* in an action in any of its courts of general jurisdiction; or (B) as directed by the foreign authority in response to a letter rogatory, when service in either case is *reasonably calculated to give actual notice*; or (C) upon an individual, by delivery to him *personally*, and upon a corporation or partnership or association, by delivery to an officer, a managing or general agent . . . .

Fed.R.Civ.P. 4(i) (emphasis added). Note also that Article 5 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 20 U.S.T. 361, T.I.A.S. No. 6638, of which Israel and the United States are both signatories, allows Israel to "require the document [which the United States seeks to serve on a party in Israel] to be written in, or translated into, the official language or one of the official languages of the State addressed."

15. *Tahan v. Hodgson*, No. 80–1102 (D.D.C. 8 Aug. 1980).

16. *Id.* at 3.

17. Note that while the public policy doctrine is not moribund, it is in fact rarely relied upon. *See* von Mehren & Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach*, 81 Harv.L.Rev. 1601, 1670 (1968); Paulsen & Sovern, *"Public Policy" in the Conflict of Laws*, 56 Colum.L.Rev. 969, 980, 981, 1015, 1016 (1956). Only in clear-cut cases ought it to avail defendant.

18. *Hilton* itself stands for the proposition that American courts have been signally reluctant to deny recognition to foreign judgments by virtue of mere difference of procedure (one plaintiff was permitted to testify without oath and without cross-examination). Other authority is collected in A. Ehrenzweig, A Treatise on the Conflict of Laws § 55 (1962); Reese, *The Status in This Country of Judgments Rendered Abroad*, 50 Colum.L.Rev. 783, 795 n.65 (1950), including *Newton v. Hunt*, 59 Misc. 633, 112 N.Y.S. 573 (Sup.Ct.1908), *modified on other grounds*, 134 A.D. 325, 119 N.Y.S. 3 (1909), *aff'd*, 201 N.Y. 599, 95 N.E. 1134 (1911) (foreign court resorted to rule of presumptive evidence not available in forum of enforcement); *Matter of Rutherfurd*, 182 Misc. 1019, 46 N.Y.S.2d 871 (Sur.Ct.1944) (under French law, in a suit of debt the plaintiff may request the defendant to take a "decisive oath," and whether or not the oath is taken determines the case. Defendant took the oath at plaintiff's request and the judgment was held conclusive as against plaintiff's attack); *Dunstan v. Higgins*, 138 N.Y. 70, 75, 33 N.E. 729, 730 (1893) (to the effect that if the procedure is non-discriminatory and that usually afforded citizens of the foreign country, it is not subject to attack).

With respect to the argument that enforcement of this judgment would violate the American policy against holding corporate officers personally liable for corporate debts, it should be pointed out that Israel also has a policy against lightly piercing the corporate veil.[19] Defendant's arguments against holding him, rather than his corporation, liable could have and should have been made in Israel. He cannot fail to contest the Israeli plaintiff and then declare that he would have won. Our examination of the record, moreover, convinces us that the Israeli court's decision to pierce the corporate veil is not "repugnant" under the facts of this case, particularly when it is borne in mind that defendant did not present a case at all.[20]

## C. *The Reciprocity Requirement*

■ It is unlikely that reciprocity is any longer a federally mandated requirement for enforcement of foreign judgments [21] or

*Cf. Ingenohl v. Olsen & Co.*, 273 U.S. 541, 47 S.Ct. 451, 71 L.Ed. 762 (1927) (enforcing Hong Kong judgment in trademark suit despite holding in Philippine lower court that Hong Kong judgment evidenced "clear mistake of law or fact").

**19.** *See, e. g.*, M. Heth, The Legal Framework of Economic Activity in Israel 79–98 (1967). Like American law, much of Israeli law is English common law. *See* Apelbom, *Common Law* A L'Americaine, 1 Israel L.Rev. 562 (1966).

**20.** Nor is it violative of American public policy to enforce a judgment which includes the award of attorneys' fees to plaintiff. There are of course many countries which do not follow the "American rule" and, instead, require that the losing side in a lawsuit pay the attorneys' fees of the winner. Given the fact that this practice is followed in many civilized and advanced foreign judicial systems, and the fact that even the American judicial system occasionally awards attorneys' fees, we think that enforcement of this part of the Israeli court's judgment is appropriate. There is a precedent for this view. *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435 (3d Cir. 1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972), enforced an English court's default judgment, including the requirement that defendant pay attorneys' fees. The Third Circuit court quoted approvingly from the district court's opinion:

The Court finds that . . . while Pennsylvania may not agree that these elements should be included in damages for breach of contract, the variance with Pennsylvania law is not such that the enforcement 'tends clearly to injure the public health, the public morals, the public confidence in the purity of the administration of the law, or to undermine that sense of security for individual rights, whether of personal liberty or public property, which any citizen ought to feel, is against public policy.'

*Id.* at 443 (citations omitted).

**21.** The reciprocity doctrine has been widely criticized and seldom invoked. *See* G. Stumberg, Principles of Conflict of Laws 127–30 (1963); J. Beale, The Conflict of Laws § 434.3

(1935); Peterson, *Foreign Country Judgments and the Second Restatement of Conflict of Laws*, 72 Colum.L.Rev. 220, 233–36 (1972); von Mehren & Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach*, 81 Harv.L.Rev. 1601, 1660–62 (1968); Reese, *The Status in This Country of Judgments Rendered Abroad*, 50 Colum.L.Rev. 783, 790–93 (1950); Comment, *Reciprocity and the Recognition of Foreign Judgments*, 36 Yale L.J. 542 (1927). It has been pointed out that even in *Hilton* the doctrine was unnecessary to reach the holding and was thus mere "magnificent dictum." *Johnston v. Compagnie Générale Transatlantique*, 242 N.Y. 381, 388, 152 N.E. 121, 123 (1926). *See also* H. Goodrich & E. Scoles, Conflict of Laws § 208 (1964).

Moreover, the federal courts may now be required by *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to apply the rule of the state in which they sit as to the measure of respect that should 'be accorded the judgment of a foreign nation. *See* Restatement (Second) Conflict of Laws § 98, Comment e (1971). It is certainly true that some state courts, notably those of New York, have expressly rejected the *Hilton* requirement of reciprocity and extended recognition to judgments of foreign nations without regard to any question of reciprocity. Cases and statutes rejecting or undermining the doctrine of federally mandated reciprocity include: *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435 (3d Cir. 1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972); *Svenska Handelsbanken v. Carlson*, 258 F.Supp. 448 (D.Mass.1966); *Direction der Disconto-Gesellschaft v. U.S. Steel Corp.*, 300 F. 741 (S.D.N.Y. 1924), *aff'd*, 267 U.S. 22, 45 S.Ct. 207, 69 L.Ed. 495 (1925); *Cowans v. Ticonderoga Pulp & Paper Co.*, 219 A.D. 120, 219 N.Y.S. 284, *aff'd*, 246 N.Y. 603, 159 N.E. 669 (1927); *Johnston v. Compagnie Générale Transatlantique*, 242 N.Y. 381, 152 N.E. 121 (1926); and the Uniform Foreign Money Judgments Recognition Act, 13 U.L.Ann. 417 (Master ed. 1980), approved in 1962 by the National Conference of Commissioners on Uniform State Laws and adopted by eleven states. New Hampshire has passed a statute requiring reciprocity with respect to

that the District of Columbia itself has such a requirement that this court is obliged to follow.[22]

■ The logical rule would seem to be that, in the absence of an action by the legislature, the courts should refrain from creating or resurrecting a reciprocity doctrine. The issue of how best to respond to a foreign nation's scrutinization of an American judgment is, after all, a political one. Moreover, notwithstanding *Erie Railroad Co. v. Tompkins*,[23] the issue seems to be national rather than state.[24]

■ Even assuming that reciprocity is required by either the federal government or the District of Columbia, we would still enforce the Israeli judgment since Israel in all probability *would* enforce a similar American judgment and thus meets the reciprocity criterion.[25] Israel provides for enforcement of foreign judgments by a statute, which reads in relevant part that

> in dealing with and for the purposes of a matter within its jurisdiction, a court or tribunal in Israel may recognize a foreign judgment even if subsection (a) [providing for recognition of foreign judgments where an agreement with a foreign state specifically so mandates] does not apply to it, if it considers it lawful and just to do so.[26]

Israeli courts have indeed ruled that a party with a foreign judgment may, if it wishes, bring a suit on the foreign judgment in a local Israeli court and obtain an Israeli judgment.[27]

## III. CONCLUSION

As commerce becomes increasingly international in character, it is essential that businessmen recognize and respect the laws of those foreign nations in which they do business. They cannot expect foreign tribunals to have one set of laws for their own citizens and another, more favorable, set for the citizens of other countries. It is also essential that American courts recognize and respect the judgments entered by foreign courts to the greatest extent consistent with our own ideals of justice and fair play. Unfettered trade, good will among nations, and a vigorous and stable international—and national—economy demand no less.

We find enforcement of the Israeli judgment to be required by these goals and American precedent. The judgment of the district court is accordingly

*Reversed and Remanded.*

Canadian judgments (N.H.Rev.Stat.Ann. § 524:11 (Equity Supp. 1974–75)).

**22.** In *Cherun v. Frishman*, 236 F.Supp. 292, 294 (D.D.C.1964), Judge Tamm reviewed the requirement of reciprocity in his discussion of *Hilton* but had no occasion to invoke it under the facts of that case. There is no evidence that the District of Columbia has a reciprocity requirement. *See* D.C.Code Ann. § 12–307 (1973 & Supp. VII 1980).

**23.** 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**24.** *See Zschernig v. Miller*, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 421–27, 84 S.Ct. 923, 936–40, 11 L.Ed.2d 804 (1964). *See also* Ginsburg, *Recognition and Enforcement of Foreign Civil Judgments*, 4 Int'l Law. 720, 733 (1970); Homburger, *Recognition and Enforcement of Foreign Judgments*, 18 Am.J.Comp.L. 367, 385–90 (1970); Kulzer, *Recognition of Foreign Country Judgments in New York: The Uniform Foreign Money-Judgments Recognition Act*, 18 Buff.L.Rev. 1 (1969).

**25.** Israel and the United States have a long and formal history of cooperation in commercial matters. *See* U.S.-Israel Friendship, Commerce and Navigation Treaty, 5 U.S.T. 550, T.I.A.S. No. 2948; Joint Statement of U.S.-Israel Joint Committee for Investment and Trade, 26 U.S.T. 1674, T.I.A.S. No. 8127.

**26.** Foreign Judgments Enforcement (Amendment No. 2) Law, 5738–1977.

**27.** *Winter v. Kovach*, 17 P.D. 2032 (1963); *Rosenbaum v. Guli*, 18 P.D. 374 (1964) II. For a discussion of these two cases, see Goldwater, *Amendments to the Foreign Judgments Enforcement Law*, 10 Israel L.Rev. 247 (1975).