Peter R. ACKERMANN, Dieter Schultze-Zeu, Dietger Feder, Detlef P. Eulitz and Karl-Heinz Lingner, Plaintiffs,

v.

Ira LEVINE, Defendant.

No. 82 Civ. 0791 (IBC).

United States District Court, S.D. New York.

May 20, 1985.

Walter, Conston & Schurtman, P.C., New York City, for plaintiffs; William M. Barron, Eric Stenshoel, New York City, of counsel.

Ralph S. Naden, New York City, for defendant.

IRVING BEN COOPER, District Judge.

Plaintiffs, citizens of the Federal Republic of Germany and partners in the law firm of Ackermann & Schultze-Zeu, a partnership organized under the laws of the Federal Republic of Germany with its principal place of business in Berlin, West Germany, bring this action to enforce a judgment entered on December 12, 1980 by the Regional Court of West Berlin in favor of plaintiffs and against defendant, a resident of the City and State of New York, in the amount of Deutsche Marks ("DM") 190,-708.49 plus interest at the rate of four percent per annum and costs. The case was tried to the Court on May 7–9, 1984; we reserved decision at the conclusion of the trial.[1]

FACTS

In 1979 defendant was a general partner in Hudson View Associates, a partnership engaged in developing for sale a piece of real estate located in Edgewater, New Jersey called "Edgewater Towers." (Ex. 1, ¶ 2)[2] The sales price of the "entire project was 20 million. [Mr. Levine] was only interested in selling [his] property [for 6 million]." (Tr. 333) At the time defendant was looking for buyers, a friend of his introduced him to a West German businessman named Gottlieb Bauer-Schlichtegroll ("Bauer"). (Tr. 305) Bauer informed defendant that he knew "many, many people in Germany that would be interested in financing the project [and] in particular, he named a gentleman by the name of Mr. Peter Kuth." (Tr. 306) In pursuit of the opportunity, defendant furnished Mr. Bauer (at a meeting during the spring of

---

1. Plaintiffs' and Defendant's post-trial memoranda were filed with the Clerk of the Court on July 2, 1984; plaintiffs' reply brief was filed on July 13, 1984.

2. Throughout this opinion, the letters "Ex." followed by a number in parentheses indicate a particular exhibit. The same applies to a "Tr." which refers to a specific page in the trial transcript.

1979 in the Regency Hotel in Manhattan) with financial documents and written specifications of Edgewater Towers (Ex. 1, ¶ 5); they agreed that Mr. Bauer would receive a commission of $600,000 if he effectuated a sale. (Tr. 334) Also present at the meeting was a friend of Mr. Bauer's, Walter Pfaeffle, a West German journalist living in New York who spoke both German and English and who Mr. Bauer referred to as his "financial consultant," a status not supported by the proof. (Tr. 463) At the conclusion of the meeting, Mr. Bauer agreed to keep in touch with defendant after he returned to West Germany; the two were to communicate through Mr. Pfaeffle (he possessed a Telex machine). (Tr. 306; 308) It was defendant's understanding that Mr. Pfaeffle would share in the commission. (Tr. 334)

Although Mr. Bauer was not called to testify at trial, there was considerable testimony by other witnesses, including plaintiff, defendant and Mr. Pfaeffle, about Mr. Bauer's role. Our review of all the proof and our considered estimate thereof convinces us that Mr. Bauer was a devious opportunist who told a different story to each interested party (i.e., he led them on) in order to ensure that, as he told Mr. Pfaeffle, "we will all benefit if the deal goes through." (Tr. 475) Consequently, as we shall develop below, the approach of each of those interested in the sale of the property was not comprehended by the others. Each carried in his head a different plan; all the plans were to a very large extent constructed and conveyed by Mr. Bauer.

Approximately at the beginning of May 1979, Mr. Bauer called defendant and stated he had spoken with Mr. Kuth, who defendant believed to be the principal owner of the "Titan Group" investment company in West Berlin; that Mr. Kuth was very interested in the project and urged defendant to go to West Germany to discuss it. (Tr. 310) Mr. Bauer was confirmed to some extent by a telephone call from a Mr. Langsfeld (further identification not revealed) in West Berlin to defendant who said, "Yes, we are very much interested in

doing the project ... and we wish you would come as quickly as you can possibly get here to discuss it." (Tr. 311)

Defendant decided to travel to West Germany to meet Mr. Kuth. Before leaving, however, he visited Frederic Coudert, Esq., (a New York attorney to whom he is related) to obtain the names of Berlin attorneys in case a contract was worked out there. Mr. Coudert furnished defendant with the names of three law firms, one of which was plaintiffs' firm. (Tr. 312–14; Ex. 1, ¶¶ 8, 9)

Defendant went to West Germany in late May or early June. Mr. Bauer met him at the airport and transported him to a hotel. He told defendant a meeting would be set up with Mr. Kuth. However, when Mr. Bauer returned to the hotel later that afternoon, he informed defendant that Mr. Kuth would not be available to see him, apparently because Mr. Kuth was then hospitalized. (Tr. 315–16)

Defendant was obviously distressed by this development. Mr. Bauer suggested they talk with plaintiff Peter Ackermann who he claimed was his attorney and friend, and "hopefully maybe we can have someone be helpful to you while you are here." (Tr. 317) Defendant mentioned the coincidence that Mr. Ackermann's firm had been one of those given to him by Mr. Coudert in New York.

Unbeknownst to defendant, Mr. Bauer had already discussed the Edgewater Towers project with Mr. Ackermann. Specifically, Mr. Ackermann testified:

[About one week before the meeting between myself and Messrs. Levine and Bauer], Mr. Bauer said to me that he had made the acquaintance, passing through New York, of a gentleman who was the general partner in a building project, and that he, Bauer, had said to Mr. Levine that why don't he come to Germany and try to market this project under German tax shelter law. And Mr. Bauer said to me, "Would you be interested in handling the legal and tax ramifications of such a fairly sizable project?", to which I responded, "Yes."

Mr. Bauer then gave me a stack of documents which appeared to be telexes ... detailing that particular project as well as a stack of papers that mainly referred to the conditions upon which the HUD mortgage was to be paid out to the future investor. And he explained to me that I would have to make myself acquainted with the other papers that there were, of which he understood nothing but trusted that I would read those in order to prepare for the meeting that was forthcoming with the defendant himself.

(Tr. 52–53)

During the trial Messrs. Ackermann and Levine gave entirely different descriptions of the substance of their meeting with Mr. Bauer in West Germany. Our observation of the witnesses and our careful study of the record convinces us that the two versions emanate from the two almost opposite perspectives that each man brought to the meeting. And so it was throughout the trial with respect to other vital factual occurrences. Mr. Levine's only goal was to sell his property; he preferred selling it to a German purchaser since he had learned through Mr. Bauer that he could get a substantially higher price in Germany than in the United States. (Tr. 353) He travelled to Germany with the expectation that a contract with Mr. Kuth's investment company would ensue (through the aid of Mr. Bauer who was acting as his real estate broker).

Mr. Levine's expectations were quickly diminished while he was still in Germany; before he returned (the next morning) (Tr. 329) to New York, he decided he had nothing to lose by following Mr. Bauer's suggestion of a meeting with Mr. Ackermann (who had been recommended to defendant by Mr. Coudert).

Mr. Ackermann, on the other hand, entertained high hopes of the outcome of the meeting. At that time, it was becoming profitable for Germans to invest in United States property; he testified, "It was the beginning of a certain investment priority, to invest in the United States." (Tr. 58)

Therefore, it was clearly in the interest of an attorney to develop a favorable tax shelter scheme, particularly for a multi-million dollar investment. Mr. Bauer, who knew the interests in the venture of both Messrs. Ackermann and Levine, told Mr. Ackermann before all the parties met "that he had been asked by Mr. Levine to find an attorney who could structure the deal ... in such a manner that the bank would accept it.... [T]his was not a building to be looked at and sold at a given price. This was an investment scheme to be developed. The building itself played only part of that total picture. We needed an attorney to structure an investment scheme for $21 million and not a broker to sell a piece of real estate." (Tr. 60) In short, Mr. Ackermann approached the meeting with Messrs. Levine and Bauer believing Mr. Levine wanted him to create a legal tax shelter plan. Only Mr. Bauer knew the differing state of mind of each party during their encounter.

In this light, the two different synopses given by Messrs. Ackermann and Levine of the meeting between them and attended by Mr. Bauer is comprehended. According to defendant, Mr. Bauer outlined defendant's project in very general terms and discussed the unavailability of Mr. Kuth; the meeting lasted for no more than twenty minutes. (Tr. 320–21) In contrast, Mr. Ackermann testified that:

Mr. Levine indicated that he was interested in selling this in West Germany under a tax shelter scheme that would allow the West German investors to write off, in an accelerated manner, the investments they would share in ... that particular project ...

. . . . .

He asked me whether I would see a possibility of structuring the sale of this property to be built under the German tax law to the effect that taxation writeoffs would be available to the German investor. And I told him that although I was skeptical about the financial, about the economic merits of that project, not knowing enough of it, I was not out-

spoken on that, and I told him that legally and from the tax point of view that would be a feasible avenue to entertain....

. . . . .

Mr. Levine said that he had directly contacted a bank who handles for their client real estate deals that offer tax advantages. This bank was the Grunt und Renten, which is a mortgage bank in West Berlin.... [T]his bank had shown a considerable interest in getting involved with [the Edgewater Towers] project....

[T]he bank needed more detail [regarding] whether or not there was a legal opinion, evidence, to the fact that the bank could, with a good conscience, sell that to their clients, to make it work at the end of the taxing time many years later.

And I replied that inasmuch as this is one of the fields in which our law firm operates, we would study that proposition.... I was to go to the bank as soon as I would receive from them an invitation to see them ... and explain to them the legal and taxwise ramifications of this structure that I was to develop. (Tr. 40–42) Mr. Ackermann recollected that the meeting lasted one to one and a half hours. (Tr. 42)

We find, as we have already stated, that the trial testimony of plaintiff and defendant was clouded by reason of the differing information imparted to each by Mr. Bauer and accordingly their respective state of mind upon attending the meeting. For example, the Edgewater Towers project was covered at the meeting in more detail than Mr. Levine recollects and less detail than elaborated upon by Mr. Ackermann. We are convinced by a preponderance of the credible evidence that the parties discussed, in general terms only, tax shelter schemes—a plan that benefited both Mr. Ackermann, who wanted to develop this approach, and Mr. Levine, who stood to gain financially from a German purchaser. However, we are neither persuaded that the two agreed at that time that Mr. Acker-

mann would discuss these plans with the Grunt und Renten Bank nor that Mr. Levine had previously talked with representatives of that bank.

Indeed, Mr. Levine testified, and we believe it credible, that at the meeting with Mr. Ackermann, an appointment was scheduled for defendant to go with Mr. Bauer and an accountant to the parent bank of Grunt und Renten called Grundkreditbank. (Tr. 321, 325) The conversation at the bank meeting, held immediately after the encounter at plaintiffs' office, was all in German; Mr. Bauer told Mr. Levine "that they were discussing the possible investment in [the] project in Edgewater, New Jersey" (Tr. 326) and that they spoke about the purchase price, number of units, size of land involved and financing—all in very general terms. (Tr. 327) Mr. Bauer further told Mr. Levine that "his impression of the meeting was a very favorable one and he thought the bank was very much interested in doing the project." (Tr. 328) Mr. Bauer agreed to keep in touch with Mr. Levine and apprise him of developments pertaining to the bank's involvement. (Tr. 329) In short, at the end of his business trip in West Germany, though disappointed that he had not been able to meet with Mr. Kuth, Mr. Levine believed that the Grundkreditbank might purchase the property.

Upon Mr. Levine's return to New York the next day, he received (several days later) a telephone call or telex (he did not remember which) from Mr. Bauer confirming that the bank was "very much interested in the project [but] they needed some time ... to go through their proper procedures." (Tr. 330) Mr. Levine informed him that he "was not interested in waiting, that I had many interested parties in this country who wished to buy my property." (Tr. 330) Mr. Bauer responded that the appropriate bank committee would meet within seven to ten days, a period of time to which Mr. Levine agreed on condition that he receive from them a letter setting forth their serious consideration of the project. (Tr. 331) Mr. Bauer suggested

that "because of Mr. Ackermann's relationship with the bank, we should utilize Mr. Ackermann to go into the bank and discuss the project." (Tr. 332) Mr. Levine testified that he objected, stating, " 'I don't understand at this point why we are involving Peter Ackermann in this situation.... You are acting as a broker to sell my property.' " According to defendant, Mr. Bauer responded by stating, " 'We need Mr. Ackermann to go into the bank, because of his association with the bank, and he has agreed with us to share in our commission equally.' " (Tr. 334) Evidently, Mr. Levine agreed with Mr. Bauer's reasoning, for on June 8, 1979 defendant mailed a letter to Mr. Ackermann (Ex. A) which stated:

Ackerman & Schuetze 'Zeu

Kampftrasse 13

1 Berlin 12

Attn: Peter Ackerman

Dear Peter:

I am very pleased to address this letter to you regarding our real estate project in Edgewater, New Jersey.

I wish to authorize your firm to negotiate this matter in the behalf of Hudson View Associates and I am looking forward to a successful completion of these negotiations.

Sincerely,

Ira Levine, General Partner

HUDSON VIEW ASSOCIATES

Mr. Ackermann had a different interpretation of the authorization letter. Mr. Bauer had told him that he had "been asked by Mr. Levine to find an attorney who could structure the deal ... in such a manner that the bank would accept it." (Tr. 60) Mr. Ackermann understood that when Mr. Levine returned to the United States, he would send him a complete power of attorney on Mr. Levine's letterhead (Tr. 67); Mr. Ackermann "intended to or expected to render several legal opinions upon which the banks would rely." (Tr. 508) Thus, as he saw it, the authorization letter sent by defendant gave Mr. Ackermann a power of attorney, not the power to negotiate as a broker in behalf of Mr. Levine. Indeed, plaintiff's expert witness, Mrs. Margrit Beckmann von Ruckteschell, testified that a German attorney is prohibited by statute from selling real estate. (Tr. 171) Since we are convinced by Mr. Ackermann's demeanor on the witness stand that he is a moral, upright "officer of the Court" who would not engage in the illegal practice of selling real estate, we do not hesitate to conclude that he believed he had been authorized to act as Mr. Levine's attorney.

In any event, Mr. Ackermann negotiated with the Grundkreditbank, but the objective was not achieved. As Mr. Ackermann informed Mr. Levine by telex dated June 14, 1979, "[The president and two directors] have qualified your offer as 'very interesting' but too large to handle on their own." (Ex. N) Mr. Ackermann told defendant that another bank in Frankfurt might be interested in running Mr. Levine's project as a joint venture with the Grundkreditbank and asked defendant if he would be interested in having Mr. Ackermann negotiate in his behalf. Defendant responded by stating, " 'That's up to you.' " (Tr. 440)

On June 21, 1979, Mr. Ackermann traveled to Frankfurt and met with a person named Graf Ysenburg at the Deutschen Genossenschrafts-Hypothekenbank ("DG Bank"). (Tr. 96) The DG Bank considered Mr. Ackermann's proposal but decided not to "entertain this particular project." (Tr. 97)

By letter dated July 18, 1979, plaintiffs sent defendant a letter requesting an advance payment of $10,000 for legal fees. (Ex. 1, ¶ 15) Defendant contacted Mr. Pfaeffle and said, " 'I am not paying Mr. Ackermann a penny. My understanding is that Mr. Ackermann is sharing in the commission with you and Bauer, and I don't understand this letter at all.' Walter's response to me was, 'Forget it.' " (Tr. 347) Defendant did not respond in any way to Mr. Ackermann's letter of July 18th. (Tr. 348; Ex. 1, ¶ 15)

On August 8 or 9, 1979, defendant again flew to West Berlin, but this time he finally

met with Peter Kuth and the Titan Investment Group. Messrs. Levine and Kuth signed a letter of intent evidencing the company's interest in purchasing the property.[3] (Ex. 16) Defendant did not call Mr. Ackermann while on this trip to West Germany. (Tr. 380–81)

Subsequently, on October 22, 1979, plaintiffs sent a letter terminating the alleged attorney/client agreement (Ex. 17) coupled with an itemized bill for DM 190,827.77 for legal services rendered. (Ex. 1, ¶ 16) Again, defendant did not respond.

Plaintiffs' legal fees were computed in accordance with the German fee statute called Bundesrechtsanwaltsgebuehrenordnung or BRAGO. Pursuant to the statute, each legal step taken in an action is worth a fee unit; a fee unit, in turn, is convertible to a price. Thus, for instance, initial discussion with a client is worth one fee unit; a client's authorization for the attorney to do further work is worth a second unit, and a ruling by a judge that attorneys must gather evidence makes the third and last fee unit due and payable. (Tr. 23) When in-court proceedings are at issue, attorneys will charge the value of a full fee unit. However, when the case involves out of court proceedings, a lawyer, at his or her discretion, may reduce the fee unit to as low as 50 percent of its full value. In most instances of out of court proceedings, German attorneys charge 75 percent of a fee unit. (Tr. 24) The amount each fee unit is worth depends upon the total value of a case; the greater the value of the matter, the greater the value of each fee unit. (Tr. 23, 27) For example, at the time of trial, in a commercial transaction upon which a litigant sues claiming up to DM 200, an attorney may charge DM 30 per fee unit. (Ex. 9) Thus, if the matter reaches litigation, accumulating all three fee units, the attorney may charge a maximum total of DM 90.[4] However, if the case is relatively uncomplicated and involves few in-court pro-

ceedings throughout its "life," the attorney, in his discretion, may charge as low as 50 percent of the value of each fee unit, i.e., DM 45. In contrast, if the value of a case is DM 1 million, the lawyer may charge up to DM 5,730 for each fee unit. (Ex. 9) In sum, the price charged defendant was high because the value of his realty sale was high.

It is undisputed that the parties never discussed fees prior to the litigation between them (Ex. 1, ¶ 11) and that plaintiffs did not inform defendant of the operation of BRAGO. (Ex. 1, ¶ 18)

When defendant failed to respond to Mr. Ackermann's bills, plaintiffs sued defendant in the Regional Court of Berlin (Landgericht Berlin), West Germany. (Ex. 1, ¶ 19) On January 11, 1980, the Regional Court sent the summons and complaint (in both English and German) to the Consulate General of the Federal Republic of Germany in New York together with a request that service be made upon defendant Levine and the partnership at the New Jersey business address. (Ex. 1, ¶ 20) The Consulate did so serve the summons and complaint by registered mail, and received return receipts postmarked March 13, 1980 as proof of delivery. However, Mr. Levine takes the unalterable position that he never received these documents. (Ex. 1, ¶ 21)

Six months later, on September 11, 1980, the Regional Court again sent the summons and complaint with exhibits to the Consulate with a request that they be served on defendant at his home address, 910 Fifth Avenue, Apt. 6A, New York, New York. (Ex. 1, ¶ 22) These documents were served by registered mail upon Mr. Ortiz, an employee at defendant's residential building, who gave them to defendant; the return receipt bears the postmark October 14, 1980. (Ex. 1, ¶¶ 23, 24)

Defendant did not defend the suit. On December 12, 1980, the Regional Court entered judgment in favor of plaintiffs

---

**3.** The property was eventually sold to a company called American Landmark Corporation which was affiliated with Olympia & York. (Tr. 304)

**4.** Actually, the attorney can charge more than the value of a full fee unit, but only with the written authorization of the client. (Tr. 30)

against defendant in the sum of DM 190,-708.49 plus 4 percent annual interest from October 4, 1980 plus costs. (Ex. 1, ¶ 25) By order dated January 29, 1981, costs were fixed at the rate of DM 8,590.34 plus 4 percent annual interest. (Ex. 1, ¶ 26) Defendant received notice of both the Regional Court's judgment and order in sufficient time to appeal but did not do so. (Ex. 1, ¶ 27)

Plaintiffs bring this action to enforce the German judgment and order.

THE LAW

■ It is a well-established rule that a judgment obtained in a foreign country is conclusive as to its merits unless the foreign court had no jurisdiction over the defendant, thus failing to satisfy constitutional due process, or the judgment was fraudulently obtained or offensive to the public policy of the state where enforcement is sought. *Fairchild, Arabatzis & Smith, Inc., v. Prometco Produce & Metals Co., Ltd.,* 470 F.Supp. 610, 615 (S.D.N.Y.1979); *Johnston v. Compagnie Generale Transatlantique,* 242 N.Y. 381, 152 N.E. 121 (1926).

We are fully aware that our ultimate judgment herein is predicated solely upon, and limited to, our final estimate addressed to, and exclusively based upon, these three factors. Nevertheless we believe it might prove supportive of our final decision to observe that the total trial record before us is replete with facts relating to the underlying transactions between the parties—particularly the detailed sworn testimony of the two principal witnesses, Messrs. Ackermann and Levine. From that source, in our opinion as trier of the facts, the conclusion is irresistible that at best there existed between the litigants a misunderstanding as to the essential elements of the alleged contract between them—in other words, a meeting of minds between them did not take place.

We now proceed to examine each of these factors to determine the enforceability of plaintiffs' West German judgment and order.

## I. *Jurisdiction*

■ A judgment is not valid if the connections between the defendant and the state where judgment was rendered were too insufficient to require defense of the action as a matter of fairness, *Milliken v. Meyer,* 311 U.S. 457, 463–64, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940), or if the defendant did not have reasonable notice of the action, *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 309, 313–14, 70 S.Ct. 652, 654, 656–57, 94 L.Ed. 865 (1950). *See Kulko v. California Superior Court,* 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978).

### A. *Connections Between Defendant and the Forum*

■ Jurisdictional basis is satisfied if the forum where the action is brought has minimum contacts with the parties. As the Supreme Court stated in the landmark case of *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945): "[D]ue process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" A defendant is present when he "purposefully avails [him]self of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its law." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *see Shaffer v. Heitner,* 433 U.S. 186, 216, 97 S.Ct. 2569, 2586, 53 L.Ed.2d 683 (1977); *International Shoe, supra,* 326 U.S. at 319, 66 S.Ct. at 159; *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 451–52, 261 N.Y.S.2d 8, 13–14, 209 N.E.2d 68, 71–72 (1965).

Defendant claims that his sole contacts with Germany were: (1) his late May or early June 1979 visit to Germany on the invitation of Mr. Bauer for the purpose of meeting with Peter Kuth, a likely buyer for his investment company though defendant

instead met with Mr. Ackermann; (2) his letter to Mr. Ackermann, written in New York and mailed to Germany, which authorized plaintiffs to negotiate for defendant; (3) a number of contacts between Mr. Levine in New York and Mr. Ackermann in Germany by way of telephone and telex; and (4) defendant's second visit to Germany in which he had no contact at all with Mr. Ackermann. (Defendant's Post-Trial Memorandum of Law at 62) In short, defendant argues that his total contacts with Germany concerning the events giving rise to this cause of action include one visit with Mr. Ackermann for less than one and a half hours and a number of telexes and telephone conversations. Defendant cites a host of cases holding that such contacts are not enough to confer personal jurisdiction. *See, e.g., Sayles Biltmore Bleacheries, Inc. v. Soft-Fab Textile Processors, Inc.,* 440 F.Supp. 1010 (S.D.N.Y.1977); *Concrete Detailing Services, Inc. v. Thomsson Steel Co., Inc.,* 411 F.Supp. 1021 (S.D.N.Y.1976); *Siedler v. Jacobson,* 86 Misc.2d 1010, 383 N.Y.S.2d 833 (Sup.Ct.N.Y.Co.1976).

Defendant's summary of his contacts with Germany ignore the fact that defendant authorized Mr. Ackermann to conduct ongoing negotiations in that country in defendant's behalf. In the letter dated June 8, 1979, defendant "authorize[d plaintiffs'] firm to negotiate [the real estate project in Edgewater, New Jersey] in the behalf of Hudson View Associates." (Ex. A) Pursuant to this authorization, Mr. Ackermann, acting for defendant, personally dealt with personnel at the Grundkreditbank in Berlin and afterwards with employees at the DG Bank in Frankfurt. We conclude that defendant's contacts with West Germany included the work done by Mr. Ackermann toward the end of selling defendant's New Jersey real estate to a German investor.

In *International Shoe, supra,* 326 U.S. at 319, 66 S.Ct. at 159, the Supreme Court stated:

> But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits

and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as the obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

We find that defendant, who was seeking to find a German purchaser believing that he could get a higher sales price in Germany than in the United States and consequently authorized Mr. Ackermann to conduct negotiations in his behalf in Germany, enjoyed the benefits and protections of German law. It would be manifestly unfair to allow defendant the privileges of conducting business in Germany and then hold that he is not amenable to suit there.

The cases cited by defendant which found a lack of personal jurisdiction are clearly distinguishable; in all of them, the contacts made through letters, telephone conversations and/or personal visits did not lead to further activity in the forum state. *See Sayles, supra* (letters sent by defendant to plaintiff in New York, the forum state; interstate telephone conversations; shipment to New York of "infinitesimal" amount of goods as samples; one visit by defendant to New York regarding a contract which did not give rise to the cause of action); *Concrete Detailing Services, Inc., supra* (defendant visited the forum once and negotiated a contract over the telephone); *Seidler, supra* (only contact with forum was purchase made there).

Accordingly, we find that the basis for jurisdiction in West Germany over defendant was in no way violative of constitutional due process.

### B. *Service of Process*

Proper service of process is essential to a court's exercise of jurisdiction because it ensures that the defendant has received notice of the action—a constitutional due process requirement. *Milliken v. Meyer, supra; Federal Deposit Insurance Corp. v. Spartan Mining Co., Inc.,* 96 F.R.D. 677, 681 (S.D.W.Va.1983), *aff'd*

*sub nom. Federal Deposit Insurance Corp. v. Schaffer,* 731 F.2d 1134 (4th Cir. 1984). As the Supreme Court held in *Milliken, supra,* 311 U.S. at 463, 61 S.Ct. at 342, service is adequate if it "is reasonably calculated to give [the defendant] actual notice of the proceedings and an opportunity to be heard. If it is, the traditional notions of fair play and substantial notice ... implicit in due process are satisfied."

Defendant contends that the service of the summons and complaint by registered mail to defendant at his home address, the return receipt of which was signed by Mr. Ortiz, an employee of the building where defendant resides, was improper both under the Hague Convention and German law.

### 1. *The Hague Convention*

■ The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention"), TIAS 6638, 20 U.S.T. 361, is an international treaty that has been ratified by approximately 20 countries including the United States and the Federal Republic of Germany. As a ratified treaty, the Convention is treated in the United States as "the supreme law of the land" for matters that fall within its ambit. *See Aspinall's Club Ltd. v. Aryeh,* 86 A.D.2d 428, 450 N.Y.S.2d 199, 202 (2d Dep't 1982).

Plaintiffs cite Articles 8 and 10 of the Hague Convention to support their contention that service of process was made in accordance with the treaty's provisions. Article 8 provides:

Each contracting State shall be free to effect service of judicial documents upon persons abroad, without application of any compulsion, directly through its diplomatic or consular agents.

Any State may declare that it is opposed to such service within its territory....

Article 10 of the Convention states:

Provided the State of designation does not object, the present Convention shall not interfere with: (a) the freedom to send judicial documents, by postal channels, directly to persons abroad.

The United States has not opposed either of these provisions; therefore, they are binding.

We do not read Article 10 as broadly as do the plaintiffs. It is our opinion that this provision must be read in conjunction with Article 5 which specifically discusses service of process:

The Central Authority of the State [or the diplomatic or consular agents] shall itself serve the document or shall arrange to have it served by an appropriate agency, either—

(a) by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or

(b) by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed.

Subject to subparagraph (b) of the first paragraph of this article, the document may always be served by delivery to an addressee who accepts it voluntarily....

■ In view of Article 5, we interpret Article 10 to mean that the Convention will not interfere with the freedom to send judicial documents through postal channels only when such mailing accords with the rules governing proper methods of service under the treaty. Any other construction would leave open a strong probability that due process requisites would not be satisfied.

We now examine the adequate methods of service listed in Article 5 of the Convention. First, service may be made in a way sanctioned by the internal law in domestic actions. This has been held to include federal as well as state law. *Aspinall's Club, supra.*

■ Mere mailing of a summons and complaint to a defendant, even if accompanied by a return receipt, is not sufficient to establish jurisdiction in the State of New York. To achieve valid service of process in New York, section 308 of the

C.P.L.R. requires one of the following: (1) personal delivery; (2) delivery to a person of suitable age and discretion at the defendant's place of business or residence plus mailing of the summons to the defendant's address; (3) delivery of the summons to defendant's agent for service; (4) where the above three methods cannot be accomplished, valid service mandates affixing the summons to the door of the place of business or residence and mailing the summons to the defendant at his residence; or (5) if even the last method is unsuccessful, the court may direct an alternative form of service.

█ It is clear that service of process in the instant case was not made pursuant to any of the alternatives listed in the C.P.L.R. § 308; accordingly, it did not satisfy the requirements of the law of New York State. Nor did the service satisfy the Federal Rules of Civil Procedure. Effective February 26, 1983, Fed.R.Civ.P. 4 was amended to allow, *inter alia,* more liberal forms of service of process, including merely mailing the summons and complaint by first class mail, postage prepaid to the person to be served together with two copies of a notice, an acknowledgement and a postage prepaid return envelope addressed to the sender. Fed.R.Civ.P. 4(c)(2)(C)(ii). However, this amended rule was not in existence at the time the summons and complaint were issued and served in the instant case; consequently, it has no effect. *See United States v. Bluewater-Toltrec Irrigation District,* 100 F.R.D. 687 (D.N.M. 1983); *Prather v. Raymond Construction Co.,* 570 F.Supp. 278, 280–81 (N.D.Ga.1983); *Chronister v. Sam Tanksley Trucking, Inc.,* 569 F.Supp. 464, 469 (N.D.Ill.1983). Prior to its amendment, the rule on point, Fed.R.Civ.P. 4(d)(1), provided that service upon an adult, competent person could be made: (1) personally; (2) by leaving copies at his residence with a person of suitable age and discretion then residing therein; or (3) "by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process." Without question, service of process was not accomplished in the instant

case by either of the first two alternative means.

█ Regarding the third method of service, merely acting as a defendant's agent was not enough; actual authorized appointment was necessary. Interpreting this provision, it has been held that not even service on defendants' secretary at defendants' place of business was effective when plaintiffs presented no evidence that defendants intended to appoint the secretary to receive service in their behalf. *Lamont v. Haig,* 539 F.Supp. 552 (D.C.S.D.1982). Indeed, our Court has found insufficient service under this section when the summons and complaint were served on defendant's co-employee who was not authorized to act as defendant's agent even when defendant actually received the documents. *Richards v. New York State Department of Correctional Services,* 572 F.Supp. 1168, 1173 (S.D.N.Y.1983).

Plaintiffs herein have introduced no proof whatever showing that Mr. Ortiz, the employee at defendant's residential apartment building who accepted the notice, was an agent authorized to receive service of process for defendant. Accordingly, service of process did not conform to the mandates of the federal rule effective at the time delivery of these documents was made.

Service may nevertheless be proper under the Hague Convention when it is made by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed. (Article 5 of the Hague Convention) The applicant in this case, the Presiding Judge of Civil Chamber 82 of the Regional Court of Berlin, did not request any specific method of service—only that the summons and complaint "Durch Einfache Ubergabe Zuzustellan." Defendant and the official German translator interpret this expression to mean "by simple personal service" (Tr. 285; Ex. L), which was not accomplished. Plaintiffs translate these words to mean "delivery of possession" (Tr. 302), a means which, when done in the manner the instant

papers were served, was clearly incompatible with the operative law in New York, and with due process requirements.

■ Since service of process was not effected in accordance with the Hague Convention, the governing law in the United States with respect to the question of proper service between nations, we cannot enforce the West German judgment and order. However, in order to present a complete record of findings of fact and conclusions of law, we proceed to examine the other issues presented in this case.

## 2. *Violation of Service of Process Laws in West Germany*

Much of the trial testimony was devoted to the issue of whether service of process violated the law of West Germany; if the summons and complaint were not served in accordance with the law of that country, the judgment and order would not be enforceable. Defendant contends that plaintiffs' mailing of the summons and complaint, rather than personally handing them to defendant or someone in defendant's household, violated the German Civil Procedure Code called Zivilprocessordnung, or ZPO.

Defendant's expert witness on German law, Mrs. Margrit Beckmann von Ruckteschell, testified that in order to effectuate personal service, the ZPO requires that a summons and complaint be personally handed over from the process server to the defendant (§ 180 of the ZPO); if the defendant is not present, the papers may be served on a member of the defendant's household (§ 181 of the ZPO). If that cannot be accomplished, the process server may effectuate service at defendant's business address (§ 183 of the ZPO). "But in all three cases ... it has to be handed over." (Tr. 184) Section 193 of the Code further provides that "services can also be effected by mail." (Tr. 190) However, Mrs. von Ruckteschell interpreted this provision in accordance with the commentary given by one of three authoritative sources of German procedural law, Thomas Putzo. (Tr. 191) It was the witness' understanding from this source that, although not expressly provided for in the ZPO, service by mail is only permissible in Germany and West Berlin. (Tr. 192)

Putzo's interpretation was in discord with that provided in the "ZRHO," regulations to execute service abroad prepared by either the German Ministry of Justice or the German Foreign Service Administration including the Consulate. (Tr. 272–73) The ZRHO provides that personal handing over of a summons abroad may be substituted by mail. (Tr. 273) Furthermore, section 187 of the ZPO, entitled "Cure of Defects in Service," provides in substance that "if the summons and complaint reach[ ] the party to whom [they] were directed, without proof of formally correct service or in noncompliance with service of process rules, the service can be considered valid as of the time the document reaches the party." Mrs. von Ruckteschell agreed that according to that provision, since defendant actually received the summons and complaint, any service defects were cured under the German civil code system. (Tr. 275)

Mrs. von Ruckteschell, however, insisted that service was improper because it was not in accordance with the Regional Court's directive to the Consulate: "Durch Einfache Ubergabe Zuzustellan." She testified that "Ubergabe" meant "[s]ervice by simple handing over or personal service" (Tr. 285); indeed, the translation of the German order by the German Court's official translator also stated that the Regional Court "request[s] that [the Consulate] serve these papers upon [Mr. Levine] ... by simple personal service." (Ex. L; Tr. 289) In contrast, counsel for defendant adduced a German-English dictionary published in Munich in 1980 which defined the word "Ubergabe" to mean "delivery of possession, surrender," (Tr. 302) and made no mention of "personal" delivery. Moreover, in the direct testimony of Mr. Ackermann upon his recall to the witness stand, the 1977 volume of Putzo's commentary was introduced. This version was more recent than the 1975 version from which Mrs. von

Ruckteschell read (Tr. 523), and according to Mr. Ackermann, stated that "Ubergabe" is done "most ordinarily by mail." (Tr. 517) This language was not contained in the 1975 edition. Although we recognize that Mr. Ackermann is a party to the litigation and not an expert on German law or German/English translation, we had the opportunity to judge his ability, capacity and veracity, and we believe plaintiff properly translated the term as used in the 1977 edition of Putzo's commentary.

In sum, we are not persuaded by a fair preponderance of the credible evidence that service with which we are here concerned violated West German law. However, as we have already discussed at length, service of process in this case did violate the Hague Convention, the supreme law of our land, as well as constitutional due process requisites. Since the Regional Court therefore lacked jurisdiction over defendant, we are compelled to find that we cannot enforce the German judgment and order.

## II. *Fraud*

█ If a judgment rendered in a court in a foreign country is fraudulently obtained, American courts cannot enforce it. *See Fairchild, Arabatzis & Smith v. Prometco*, 470 F.Supp. 610, 615 (S.D.N.Y.1979). However, it is well settled that the fraud "must relate to matters other than issues that could have been litigated and must be a fraud on the court." *Id.* (quoting *Overmyer v. Eliot Realty*, 83 Misc.2d 694, 371 N.Y.S.2d 246, 258 (Sup.Ct. Westchester Co. 1975)). *See Chisholm v. House*, 160 F.2d 632, 643 (10th Cir.1947).

Defendant's factual arguments on the issue of fraud as well as the majority of cases he cites in support deal with alleged fraud in the underlying transaction rather than fraud on the court. Defendant attempts to bridge this gap by arguing that acts of alleged fraud (*i.e.*, the imposition of large fees under BRAGO; the failure to disclose in full the relationship between Messrs. Bauer, Pfaeffle and Ackermann; and the failure to disclose Mr. Ackermann's affiliation with the New York law firm Lans, Feinberg & Cohen, Esqs.) (Defend-

ant's Post-Trial Memorandum of Law at 49–50) were contained in the papers submitted to the Regional Court (*id.* at 58), constituting a fraud on the court.

█ Defendant's argument is completely unpersuasive. Fraud must be proven by clear and convincing evidence, *see Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 631 (2d Cir.1976), a burden we find defendant has entirely failed to assume in light of our conclusion that neither plaintiffs nor defendant acted dishonestly; we find that nothing in the opinion of the Regional Court of Berlin suggests that plaintiffs materially misrepresented the facts as plaintiffs perceived them to be. Consequently, we are compelled to conclude that enforcement of the German court's judgment may not be precluded on this ground.

## III. *Public Policy*

█ Finally, we address the question of whether New York public policy requires that the German judgment must not be enforced. Public policy is offended if the judgment is "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought." *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir.1981) (quoting Restatement (Second) Conflict of Laws § 117, comment c (1971)). Put another way, the foreign judgment should not be enforced if it "tends clearly to injure the public health, the public morals, the public confidence in the purity of the administration of the law, or to undermine that sense of security for individual rights, whether of personal liberty or of private property, which any citizen ought to feel, is against public policy." *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 U.S. 435, 443 (3d Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972) (quoting *Goodyear v. Brown*, 55 Pa. 514, 26 A. 665, 666 (1893)). *See Loucks v. Standard Oil Co.*, 224 N.Y. 99, 110 (1918) (Cardozo, J.) (vested rights may be withheld when "the cause of action in its nature offends our sense of justice or menaces the public welfare").

Defendant argues that the enormous size of the fee charged by plaintiffs is a violation of New York public policy in view of plaintiffs' total failure to discuss fees with defendant though Mr. Ackermann, who was associated with a New York law firm, was familiar with American legal practice which makes such disclosure imperative.

 As a matter of public policy, retainer agreements between attorney and client are of particular concern to courts in the State of New York. *In re Schanzer's Estate*, 7 A.D.2d 275, 182 N.Y.S.2d 475, 479 (1st Dep't 1959). Attorneys bear the burden of proving that a compensation arrangement is fair, reasonable and fully comprehended by the client. *In re Howell*, 215 N.Y. 466 (1915); *Abrams, Kisseloff & Kissin v. 160 Bleecker Street Assocs.*, 67 A.D.2d 629, 412 N.Y.S.2d 19, 21 (1st Dep't 1979); *In re Schanzer's Estate, supra*, 7 A.D.2d 275, 182 N.Y.S.2d at 479. *See Howard v. Murray*, 43 N.Y.2d 417, 422, 372 N.E.2d 568, 570, 401 N.Y.S.2d 781, 783 (1977); *Frost v. Bachman*, 283 N.Y. 744, 745, 28 N.E.2d 969 (1940); *Whitehead v. Kennedy*, 69 N.Y. 462, 466 (1877).

In the instant case it is undisputed that the attorney, Mr. Ackermann, never mentioned the subject of attorneys fees with defendant, who he believed to be a client of his law firm (Ex. 1, ¶ 11 at 3); in fact, Mr. Ackermann never even discussed with defendant the nature and scope of their relationship. Nonetheless, plaintiffs sent defendant a bill for legal services rendered and disbursements that amounted to almost $100,000.00. It must be borne in mind that Mr. Levine not only believed that Mr. Ackermann was acting in the capacity of a broker, but defendant was also totally ignorant of the existence of and high costs incorporated in the German legal fee statute. Plaintiffs attempt to justify this failure to disclose vital information to defendant by insisting that:

It doesn't occur to us in Germany when we do legal work. It's different than it is here. You are an officer of the court, as it has been called here, and the client comes in, it's like in a doctor's office, he asks what kind of service he wants, and he is being protected by the law. The attorney, like the barrister in England, they don't talk about the financial arrangements. That is taken care of by the law. And you do your service. And when the case is closed you pass it on to bookkeeping and they draft the bill because they know the legal statute on bills much better than the attorney does, the clerks. And they submit the bill, they send it out, it gets paid, and you never see it again.

And more specifically in this case, I have a gentleman from the United States. It couldn't possibly have occurred to me, as he was referred to us by the law firm of Coudert Brothers for whom we have done work and been charging and receiving moneys according to the BRAGO. And he had a venture of class, of substance, of some difficulty, of very likely long duration. And he was showing me that [if] we could handle this very complex and very difficult and, of course, very large job, we would earn a large fee.

(Tr. 510–11)

 We read Mr. Ackermann's statement to say that in West Germany it is the responsibility of the client to know of the attorney/client legal fee statute when he or she goes to a lawyer; further, that the more the client's appearance and legal project suggest indicia of "class" and "substance," the greater is his or her responsibility to be familiar with BRAGO. We find this practice "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought," *Tahan, supra*, at 864, and violative of the requirement under New York law that the attorney, not the client, must ensure the fairness, reasonableness and full comprehension by the client of their compensation agreement. Further, if we were to hold otherwise the public's "sense of security for individual rights" would be severely undermined. *See Somportex Ltd., supra*, at 443. Accordingly, we find an additional ground for not enforcing the West German

judgment and order is that they violate the public policy of the State where plaintiffs are seeking to have them enforced.

### CONCLUSION

On the basis of the facts and the law applicable thereto as recited herein, we are constrained to, and do, find *unenforceable* the judgment and order issued by the Regional Court of Berlin on December 12, 1980 and January 29, 1981 which held in favor of plaintiffs and against defendant.

SO ORDERED.