**Peter R. ACKERMANN, Dieter Schultze-Zeu, Dietger Feder, Detlef P. Eulitz and Karl-Heinz Lingner, Plaintiffs-Appellants,**

v.

**Ira LEVINE, Defendant-Appellee.**

No. 266, Docket 85–7553.

United States Court of Appeals,
Second Circuit.

Argued Oct. 21, 1985.

Decided April 7, 1986.

* Of the United States Court of International     Trade, sitting by designation.

William M. Barron, New York City (Eric J. Stenshoel, and Walter, Conston & Schurtman, P.C., New York City, of counsel), for plaintiffs-appellants.

Ralph S. Naden, New York City, for defendant-appellee.

Before PIERCE, MINER and DAVIS,* Circuit Judges.

PIERCE, Circuit Judge:

This is an appeal from a judgment and final order of the United States District Court for the Southern District of New York, Irving Ben Cooper, *Judge*, entered May 20, 1985, 610 F.Supp. 633, following an enforcement proceeding, holding unenforceable the default judgment issued by the Regional Court of Berlin in West Germany on December 12, 1980 in favor of plaintiffs and against defendant for 190,-

* Honorable Oscar H. Davis of the United States Court of Appeals for the Federal Circuit, sitting by designation.

708.49 deutschemarks (DM), or approximately $100,000, plus interest, for legal fees allegedly owed by appellee.

Appellants argue that the district court erred in ruling that (1) service of the summons and complaint in the German suit by registered mail violated the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 20 U.S.T. 36, T.I.A.S. 6638 (Hague Convention) and constitutional due process, and (2) enforcement of the German default judgment for legal fees charged under the German fee statute and upheld by the German court would violate the public policy concern of New York courts that attorneys seeking recovery of fees "bear the burden of proving that a compensation arrangement is fair, reasonable and fully comprehended by the client." *Ackermann v. Levine*, 610 F.Supp. 633 (S.D.N.Y. 1985) (hereinafter cited as "Op."), at 647.

We hold that service of process by registered mail satisfied the Hague Convention and constitutional due process, and that enforcement of the German default judgment would not violate New York public policy to the extent that the judgment reflects an award of attorneys fees for which the attorney presented in the enforcement proceeding, at a minimum, evidence of client authorization and appropriate work product.

We therefore affirm in part and reverse in part.

## BACKGROUND

Peter R. Ackermann is a German citizen practicing law in West Berlin in the appellant law firm. Ira Levine is an American citizen engaged in the real estate business in New York, where he lives, and New Jersey, where he was the general partner of a limited partnership entitled Hudson View Associates in 1979, and at all perti-

nent times herein. In the spring of 1979, Levine was considering financing, developing and selling a proposed real estate project in Edgewater, New Jersey (the Edgewater Project). The total cost of the completed project was estimated at approximately $21 million, of which Levine's interest was approximately $6 million.[1] In May of 1979, Levine was introduced to Gottlieb Bauer Schlictegroll ("Bauer"), a West German business promoter en route from Costa Rica to West Germany via New York, and Walter Pfaeffle, a friend of Bauer and a West German journalist living in New York whom Bauer introduced to Levine as a "financial consultant." Bauer informed Levine that he knew potential German investors, including Peter Kuth. At a meeting at the Regency Hotel in New York, Levine gave to Bauer financial documents and written specifications of Edgewater Towers. It was agreed that Levine would pay Bauer a $600,000 commission if he raised the needed capital. The district court found that Bauer was "a devious opportunist who told a different story to each interested party," Op. at 636, and who thereby caused the failure of Ackermann and Levine to have a "meeting of minds." Op. at 636, 641.

Later in May, 1979, Levine received two telephone calls involving the potential interest of a German investment group called the Titan Group. Levine then visited Frederic Coudert, Esq., of the international law firm of Coudert Brothers, in New York, and asked if Mr. Coudert could represent him in West Germany. When Coudert replied that he did not have an office in West Berlin, Levine said, "I do not wish to go to Germany and sit down and hopefully sign a contract without any type of representation." Coudert then recommended three West Berlin law firms, including that of Ackermann.

---

**1.** The certified translation of the final default judgment of the Regional Court of Berlin (No. 82 0.39/79, December 19, 1979) states that the total value of the proposed transaction was $21,-600,000, of which $2,200,000 represented the value of the land, $18,800,000 represented devel-

opment and related costs, and $600,000 represented sales commission costs. *Id.*, at 3. Ackermann testified that he understood that $17 million was to be provided by a long-term Housing and Urban Development mortgage, and the balance from German investors.

In late May or early June, 1979, Levine went to West Berlin, with Coudert's list of firms, to talk with Kuth. Bauer met Levine at the airport and explained that Kuth was unavailable. Bauer suggested that Levine talk to Bauer's attorney and friend, Peter Ackermann. Noting the coincidence that Ackermann was affiliated with one of Coudert's recommendees, Levine met with Bauer and Ackermann. Unknown to Levine, a week earlier Bauer had spoken to Ackermann and given him Levine's documents, and suggested that Ackermann might be able to render legal and tax advice regarding the Edgewater Project.

The district court found that Ackermann and Levine had entirely different versions of their single pre-litigation face-to-face encounter. These two versions, like those of many other critical aspects of the record, "stem from the two almost opposite perspectives that each man brought to the meeting." Op. at 637. Levine's only goal was to sell his property, and he preferred to sell to a German investor because Bauer convinced him that he would thereby obtain a favorable price. He hoped to sign a contract with the Titan Group, and anticipated paying Bauer the negotiated $600,000 broker's fee. At the enforcement proceeding, Levine recalled meeting with Ackermann on this occasion for about twenty minutes.

Ackermann recalled a meeting with Levine lasting one to one-and-a-half hours, at which there was substantial legal discussion regarding the contemplated transaction. Ackermann understood his task to be to study the project and its structural requirements, as was customary for his firm to do, and then to explain to German banks "the legal and taxwise ramifications of this structure that I was to develop."

It is undisputed that the parties never discussed attorneys fees or the nature of their relationship. Ackermann testified, however, that Levine told him that he had been referred to Ackermann by the Coudert firm. The district court found "that the parties discussed, in general terms only, tax shelter schemes—a plan that ben-

efited both Mr. Ackermann, who wanted to develop this approach, and Mr. Levine, who stood to gain financially from a German purchaser." The court also found that while there was no agreement for Ackermann to begin talks with any bank, it was resolved that Levine, Bauer and an accountant would commence talks with the Grundkreditbank in West Berlin. This conversation at the bank immediately followed the meeting with Ackermann, and was conducted entirely in German, which Levine apparently does not speak. Afterwards, Bauer explained to Levine that he thought the meeting was favorable, and that he would keep him apprised of subsequent developments.

Levine returned to New York the next day. Several days later, Bauer sent word that the bank remained interested but needed some time to consider the deal. Levine responded that he would not wait, as he had interested investors in the United States. Bauer replied that the bank needed only seven to ten days, to which Levine then agreed. Bauer suggested that "because of Mr. Ackermann's relationship with the bank, we should utilize Mr. Ackermann to go into the bank and discuss the project." Levine testified that he said, " 'I don't understand at this point why we are involving Peter Ackermann.... You are acting as a broker to sell my property.' " Levine further testified that Bauer explained, " 'We need Mr. Ackermann to go into the bank, because of his association with the bank, and he has agreed with us to share in our commission equally.' " On June 8, 1979, Levine wrote to Ackermann, stating:

> Ackerman & Shuetze 'Zeu
>
> Kampftrasse 13
>
> 1 Berlin 12
>
> Attn: Peter Ackerman
>
> Dear Peter:
>
> I am very pleased to address this letter to you regarding our real estate project in Edgewater, New Jersey.
>
> I wish to authorize your firm to negotiate this matter in the behalf of Hudson View Associates and I am looking for-

ward to a successful completion of these negotiations.

Sincerely,

Ira Levine,

General Partner

HUDSON VIEW ASSOCIATES

The district court found Ackermann to be a "moral, upright 'officer of the Court,'" Op. at 639, who reasonably believed that Levine wanted him to structure the deal as part of his duties in negotiating with the bank, rather than to act as a real estate broker, which Judge Cooper found lawyers may not lawfully do in Germany. *Id.*

On June 14, 1979, Ackermann sent Levine the following telex:

\* \* \* \* \* \*

6/14/79 2:30 p.m.

att: mr. ira Levine

re: edgewater towers

dear ira,

during a 2 hour session i have presented this project to the president of grundkreditbank and his two directors.

they have qualified your offer as 'very interesting' but too large to handle on their own.

they will attempt to convince another bank in frankfurt to run this as a joint venture. appropriate contacts will be made tomorrow.

in the event that the frankfurt bank—which has not yet been disclosed—shows serious interest, do you want me to negotiate the project with them?

best regards,

peter r. ackermann

\* \* \* \* \* \*

Levine testified that he then called Ackermann, disappointed that the original proposal to the Grundkreditbank was rejected, and that in response to the question in Ackermann's letter, he said, "That's up to you."

2. Levine asked Coudert whom he preferred to represent, and Coudert preferred Titan. The record does not appear to indicate who, if anyone, represented Levine in the prospective deal

On June 21, 1979, Ackermann went to Frankfurt to present the deal to the second bank. That effort failed.

On June 26, 1979, Ackermann appears to have sent a letter to Levine at Levine's New Jersey business address, which Levine no longer used. A second letter, dated July 18, 1979, having been sent to the same address, reached Levine. Therein, Ackermann wrote that he had not received an answer to the June 26 letter; that he had had lengthy conversations with a Mr. Kulisch and a group of investors, which he expected to continue, in which case he would ask Levine to come to Germany; that he recommended that the deal be structured around a limited partnership in New Jersey and one in Germany; and that he requested a $10,000 deposit. The deposit was "to be applied against fees and expenses for which we will account in due course." Levine testified that he received the letter, that he never sent the money, and that he never responded to the letter.

Ackermann testified before Judge Cooper that by the end of July he had spent fifteen to twenty full working days on the project. However, Ackermann stated in a deposition that neither he nor his firm had prepared any written studies or formal memoranda, and that he did not believe that his files would contain any handwritten notes regarding the project. In the enforcement action, Ackermann did not offer into evidence any written work or other documentation as to the fifteen to twenty days during which he allegedly worked on the project.

On August 8 or 9, 1979, Levine went to West Berlin to continue negotiations with the Titan Group. He did not call or meet with Ackermann. He did sign a letter of intent with Titan, whose attorneys in that transaction were apparently Coudert Brothers.[2]

On October 22, 1979, Ackermann sent his bill for legal services to Levine. The fees

with Titan. In any event, that deal was never effectuated. The property was eventually sold to American Landmark Corporation, an affiliate of Olympia & York. Op. at 640 n.3.

were computed in accordance with the German legal fee statute called Bundesrechtsanwaltsgebuehrenordnung, or BRAGO. Under the statute, each legal step taken in an action constitutes a fee unit which in turn is converted into a price that reflects both the value of the legal questions or financial transaction and the percentage (from 50 to 100%) of the total fee unit that the attorney decides to charge.[3] As most German lawyers do in non-litigation work, Ackermann charged Levine 75% of the allowable fee units. Ackermann's letter itemized the bill in two main parts: 89.347,-50 DM for studies and client counseling, and the same for discussions with banks.[4]

On January 11, 1980, suit was initiated herein to recover legal fees when the German court sent a summons and complaint to the German Consulate in New York, which mailed them by registered mail to Levine's former New Jersey address. Although a receipt postmarked March 13, 1980, was received, Levine claims that he never received such process. A second summons and complaint was sent by the same method to Levine's Manhattan apartment, and was received by a building employee, Ortiz; the receipt was postmarked October 14, 1980. Levine acknowledges receipt of the summons and complaint and actual knowledge of the suit. Indeed, Levine testified that on at least one occasion before judgment was entered, he consulted with Frederic Coudert, Esq. about the suit, and he decided to ignore it. A default judgment was entered on December 12, 1980, and an "engrossment" informing Levine of that judgment was sent on December 18, 1980. The time to appeal having lapsed, the judgment became final on February 20, 1981.

Plaintiffs commenced an action seeking enforcement of the foreign judgment in the United States District Court for the Southern District of New York on February 8, 1982. Levine appeared and the matter was tried to the court. By opinion dated May 20, 1984, Judge Cooper declined to enforce the German judgment on two grounds: (1) the service of process by registered mail violated the Hague Convention and due process, and (2) recognition and enforcement would violate New York public policy. Plaintiffs appeal from that decision.

## DISCUSSION

We are confronted here with issues relating to the recognition and enforcement of a foreign judgment in a case involving attorney-client relations in an international business context. The district court appropriately framed the issues in accordance with the well-settled rule that a final judgment obtained through sound procedures in a foreign country is generally conclusive as to its merits *unless* (1) the foreign court lacked jurisdiction over the subject matter or the person of the defendant; (2) the judgment was fraudulently obtained; or (3) enforcement of the judgment would offend the public policy of the state in which enforcement is sought. *See, e.g., Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co.*, 470 F.Supp. 610, 615 (S.D.N.Y.1979); *Johnston v. Compagnie*

---

3. The attorney may also charge more than the value of a fee unit if he has the client's written consent. Op. at 640 n.4.

4. The complaint stated, and the Regional Court ultimately considered, the following additional charges:

| | | |
|---|---|---|
| 3. | Telephone, telex and postage expenses, Art. 26, BRAGO | DM 30.00 |
| 4. | Xerox (112 pages), Art. 27 BRAGO | DM 112.00 |
| 5. | Travel expenses to Frankfurt on July [sic] 21, 1979 | |
| | a) air fare BER-FRA-BER | DM 248 |
| | b) airport taxi | DM 50 |
| | c) carpark Berlin-Tegel | DM 6 |
| | d) fee for out-of-town trip, Art. 28 BRAGO | DM 40 |
| | Total: | DM 344.00 |
| | [Plus Nos. 1 and 2] | 179,181.00 |
| 6. | Turnover tax 6.5% | 11,646.77 |
| | | DM 190,827.77 |

The Regional Court reviewed these charges in entering a default judgment and approved all but the photocopy costs and corresponding value-added tax since those costs were apparently included in the business fee under court practice. The judgment award thus became DM 190,708.49 plus 4% interest pursuant to Art. 291, BGB.

*Generale Transatlantique,* 242 N.Y. 381, 152 N.E. 121 (1926). In light of the existence of the Hague Convention and the underlying substantive issues regarding public policy, this case requires us to consider issues which this court has had little opportunity to address.

### I.

■ To be subject to *in personam* jurisdiction,[5] a defendant must have had certain "minimum contacts" with the forum state, *see, e.g., International Shoe v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Milliken v. Meyer,* 311 U.S. 457, 463–64, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940) ("connections"), and reasonable notice of the pendency of the action, *see, e.g., Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 313–14, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). We agree with the district court that under the "minimum contacts" test of *International Shoe* and its progeny, Levine had sufficient contacts with West Germany such that he was "avail[ing] himself" of the privileges arising therein, *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), so that the exercise of *in personam* jurisdiction would not offend "traditional notions of fair play and substantial justice," *Milliken v. Meyer,* 311 U.S. at 462–64, 61 S.Ct. at 342–43.[6]

We therefore move to the question of whether service of the summons and complaint by registered mail provided Levine with adequate notice of the action.

■ Service of process must satisfy both the statute under which service is effectuated and constitutional due process.[7] The statutory prong is governed principally by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Hague Convention), an international treaty that has been ratified by approximately twenty-three countries, including the United States and the Federal Republic of Germany. *See* Department of State, *Treaties in Force—January 1, 1985,* 259 (1985). As a ratified treaty, the Convention is of course "the supreme law of the land." *See* U.S. Const. Art. VI, cl. 2; *Aspinall's Club v. Aryeh,* 86 A.D.2d 428, 450 N.Y.S.2d 199, 202 (App.Div.2d Dep't 1982); *American Trust Co. v. Smyth,* 247 F.2d 149, 152 (9th Cir.1957).

■ The service of process by registered mail did not violate the Hague Convention. Plaintiffs declined to follow the service route allowed under Article 5 of the Convention, which permits service via a "Central Authority" of the country in

---

5. As to the issue of subject matter jurisdiction, which appellee does not contest, this case arose under the district court's diversity jurisdiction. The Regional Court of Berlin apparently had jurisdiction in Germany to hear actions arising under the BRAGO statute. *See* Certified Translation, Final Judgment in Default, File Nr.: 82 0.39/79 (Dec. 19, 1980), *reprinted in* Jt.App. A–9, at A–14, *citing* art. 29 ZPO.

6. Specifically, those contacts were: (1) Levine's late May or early June 1979 visit to Germany, during which he consulted with Ackermann; (2) Levine's letter to Ackermann, authorizing him to negotiate on his behalf; (3) several contacts between Levine in New York and Ackermann and others in Germany via telephone and telex; and (4) Levine's second visit to Germany in August, during which he did not speak with Ackermann but did pursue German investors for the Edgewater Project. The district court also noted that pursuant to contact (2), Ackermann, acting for Levine, personally dealt with

two banks in Germany. Also, Levine himself, during his first visit, attended a meeting with representatives of the Grundkreditbank.

7. Defendant-appellee also argues that service violated service of process laws of West Germany. *See* Brief of Defendant-Appellee at 40 & n.\*, *citing Appel v. Scheuler,* 78 Civ. 582 (E.D.N.Y. 1979). *Appel,* however, addressed service of process under German law prior to German ratification of the Hague Convention in 1979, and is therefore inapposite. Further, since foreign law is to be determined by the court, in light of both evidence admitted and the court's own research and interpretation, *see* Fed.R. Civ.P. 44.1, Judge Mishler's findings of effective service under German law in *Appel* did not preclude Judge Cooper or this court, upon review, from finding that, under the evidence presented herein, service did not violate current German law. *See also* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2444 (1971 and Supp.1985).

which service is to be made.[8] Instead, plaintiffs chose to follow the equally acceptable route allowed under Articles 8 and 10. *See Shoei Kako v. Superior Court*, 33 Cal.App.3d 808, 109 Cal.Rptr. 402 (1973). Article 8 permits each contracting state "to effect service of judicial documents upon persons abroad ... directly through its diplomatic or consular agents."[9] The Regional Court of Berlin availed itself of this method by first sending the summons and complaint to the German Consulate in New York. As to the forwarding of those documents by registered mail from the Consulate to Levine's residence, the method of service was appropriate under Article 10(a), which states in pertinent part:

"Article 10—Provided the State of destination does not object, the present Convention shall not interfere with—

"(a) the freedom to send judicial documents, by postal channels, directly to persons abroad...."[10]

Since the United States has made no objection to the use of "postal channels" under Article 10(a), service of process by registered mail remains an appropriate method of service in this country under the Convention. *See Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, 30 (1984); 1 B. Ristau, International Judicial Assistance (Civil and Commercial) § 4–10 at 132 (1984). Further, as appellants' counsel have documented, the word "send" in Article 10(a) was intended to mean "service." *See* Ristau, *supra*, § 4–28 at 165–67 (reviewing the *Rapporteur's* report on the final text of the Convention and reaching the "inescapable" conclusion that use of "send" rather than the otherwise consistently used "service" "must be attributed to careless drafting"). *See also Shoei Kako*, 33 Cal.App.3d at 821–22, 109 Cal.Rptr. at 411–12 ("The reference to 'the freedom to send judicial documents by postal channels, directly to persons abroad' would be superfluous unless it was related to the sending of such documents for the purpose of service.").[11]

Federal courts construing the Hague Convention have apparently consistently upheld mail service thereunder to defend-

**8.** Article 2 provides in pertinent part:
Each contracting State shall designate a Central Authority which will undertake to receive requests for service coming from other contracting States and to proceed in conformity with the provisions of articles 3 to 6.
Article 5 provides in pertinent part:
The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either—
(a) by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or
(b) by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed.
Pursuant to an Executive Order, the Central Authority for the United States is the Department of Justice, Office of Foreign Litigation, which, through the offices of the United States Marshall, handles approximately 2,000 requests for service under the Convention each year. *See Aspinall's Club*, 86 A.D.2d 428, 450 N.Y.S.2d at 200.

**9.** Further, Article 5 provides in pertinent part:
Each contracting State shall be free to effect service of judicial documents upon persons abroad, without application of any compulsion, directly through its diplomatic or consular agents.
The phrase "without application of any compulsion" is not further clarified by the Convention, but the phrase has been held to refer to "compulsory process," such as subpoenas or orders to produce documents, and not to "notice process," such as the service of a summons and complaint, which merely notifies the recipient of an action against him, but carries no direct compulsion under threat of contempt of court. *Federal Trade Commission v. Compagnie de Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1312–15 (D.C.Cir.1980). Thus, the phrase does not proscribe service under Article 8 in this case.

**10.** Article 10(b) permits, barring any objection by the State of destination, service "directly through the judicial officers, officials or other competent persons of the State of destination."

**11.** We therefore agree with the California appellate court's rejection of the holding of two New York State decisions, *Reynolds v. Koh*, 109 A.D.2d 97, 490 N.Y.S.2d 295 (3d Dep't 1985), following *Ormandy v. Lynn*, 122 Misc.2d 954, 472 N.Y.S.2d 274 (Supreme Court, Del.Co.1984), that "send" in Article 10(a) does not refer to service of process.

ants in, for example, Japan, which, like the United States, is a signatory to the Convention and has not objected to mail service under Article 10(a). *See Sieger v. Zisman,* 106 F.R.D. 194 (N.D.Ill.1985); *Weight v. Kawasaki Heavy Industries,* 597 F.Supp. 1082, 1085–86 (E.D.Va.1984); *Chrysler v. General Motors,* 589 F.Supp. 1182, 1206 (D.D.C.1984). To uphold mail service when effected against foreign defendants in signatory states that do not object to such service, but to invalidate such service when effected against an American defendant would undermine the Hague Convention's purpose of unifying the rules of service of process abroad. *See* Preamble to the Convention; *cf. Tamari v. Bache,* 431 F.Supp. 1226, 1228 (N.D.Ill., 1977) *aff'd.,* 565 F.2d 1194 (7th Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978); *Shoei Kako,* 33 Cal.App.3d at 821, 109 Cal. Rptr. 402.

■■■ Nor was service ineffective because it did not satisfy the Federal Rules of Civil Procedure. The old Federal Rule 4 was superceded by the Hague Convention and thus presumptively should not limit application of the Convention. *See Cook v. United States,* 288 U.S. 102, 119, 53 S.Ct. 305, 311, 77 L.Ed. 641 (1933) (subsequent treaty given effect over prior, inconsistent federal statute). The district court correctly notes that Amended Rule 4(c)(2)(C)(ii), permitting mail service conforming to certain technical requirements, did not exist when Ackermann's summons and complaint were served. In any event, whether Ackermann's service satisfied Rule 4 as it then existed or as it now exists is irrelevant because the United States has made no declaration or limitation to its ratification of the Convention regarding Federal Rule 4, or Article 10(a) of the Convention or otherwise regarding mail service under the Convention. *See* Siegel, *Practice Commentaries on FRCP 4, reprinted in* 28 U.S.C.A. Rule 4 (1985 Cum.Ann.Pocket Part) at 101 (listing U.S. declarations as to the Hague Convention). Thus, the Convention "supplements"—and is manifestly *not* limited by—Rule 4. *See id.* at 69.

■■■ The district court erred in holding that service under the Convention must satisfy both federal and state law. *See* Op. at 643. The court improperly cited *Aspinall's Club,* 450 N.Y.S.2d at 199, for that proposition. *Aspinall's Club* expressly held quite the opposite—that service of process under the Convention must satisfy federal *but not state* law. *See Aspinall's Club,* 450 N.Y.S.2d at 202 (service on an adult at defendant's residence must satisfy Federal Rule 4 but not the more stringent requirements under N.Y.C.P.L.R. § 308(2)). Indeed, it seems to us that the only reason that service had to satisfy even Federal Rule 4 in *Aspinall's Club* was that the Convention is silent as to service on persons other than the defendant. Thus, some external law was needed to fill the interstices of the Convention, and the court in *Aspinall's Club,* though a state court, noted that "the Federal laws and treaties" are supreme to state law on this point, and that it would be "untenab[le]" to "promot[e] New York law over the Convention and the Federal Rule." *Id.* In sum, where the Convention provides a rule of decision, that rule is dispositive, barring any contrary declaration by the United States; where the Convention is silent, federal law should govern where possible.

To construe the Convention otherwise would unduly burden foreign judgment holders with the procedural intricacies of fifty states. *Cf.* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4473 at 743 (1981) ("It is intrinsically awkward to confront foreign judgments with the potentially divergent law of fifty states and federal courts, and recognition of foreign judgments at least touches concerns of foreign relations in which the national government has paramount interests."). While we could not similarly subordinate New York's interests in the *public policy* implications of the subject foreign judgment, as discussed *infra,* New York's rules regarding service are undoubtedly less compelling. *See Hanna v. Plumer,* 380 U.S. 460, 469, 85 S.Ct. 1136, 1143, 14 L.Ed.2d 8 (1965) (state service rules not

"substantial" enough to override federal rule); *Morse v. Elmira Country Club,* 752 F.2d 35, 38 (2d Cir.1984) (same).

■ It is of no moment that an employee of appellee Levine's apartment building received and signed for the service of process. First, as to this issue on which the Convention is silent, Federal Rule 4 requires merely that service be made on one of suitable age and discretion at the defendant's residence. *See Aspinall's Club,* 450 N.Y.S.2d at 202. Second, contrary to dicta in *Aspinall's Club* as to the more stringent requirements of the CPLR, even New York law may permit service upon one of suitable age and discretion who accepts process for residents of an apartment building. *See Braun v. St. Vincent's Hospital and Medical Center,* 57 N.Y.2d 909, 456 N.Y.S.2d 763, 442 N.E.2d 1274 (1982); *E.I. DuPont, Glore, Forgan & Co. v. Chen,* 41 N.Y.2d 794, 396 N.Y.S.2d 343, 364 N.E.2d 1115 (1977).

■ Finally, service by registered mail does not violate constitutional due process. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (due process permits service of process by mail so long as such service provides "notice reasonably calculated ... to provide interested parties notice of the pendency of the action"). *See also Federal Trade Commission v. Compagnie de Saint-Gobain-Pont-A-Mousson,* 636 F.2d 1300, 1313 & n.4 (D.C.Cir.1980); *cf.* 4 C. Wright & A. Miller, Federal Practice & Procedure § 1134 at 563–64 (1969 and Supp.1977) (noting constitutional requirements).

## II.

■ There is no basis to believe that the German judgment was fraudulently obtained. Defendant-appellee has offered no basis for us to question the district court's finding of fact that "neither plaintiffs nor defendant acted dishonestly," Op. at 646, or the court's corollary conclusion of law that the German judgment was not fraudulently obtained. *Id.* at 646, *citing Fairchild,* 470 F.Supp. at 615 (alleged fraud

"must relate to matters other than issues that could have been litigated and must be a fraud on the court") (quoting *Overmyer v. Eliot Realty,* 83 Misc.2d 694, 371 N.Y. S.2d 246, 258 (Sup.Ct.Westchester Co. 1975)).

## III.

The district court held that, based on the undisputed fact that Ackermann never discussed fees with Levine, the German judgment was rendered unenforceable as violative of New York's public policy that "the attorney, not the client, must ensure the fairness, reasonableness and full comprehension by the client of their compensation agreement." *See Op.* at 646–647 (citing New York cases). On that basis, the district court declined enforcement of the entire award of approximately $100,000.

■ A judgment is unenforceable as against public policy to the extent that it is "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought." *Tahan v. Hodgson,* 662 F.2d 862, 864 (D.C.Cir.1981) (quoting Rest.2d Conflict of Laws § 117, comment c (1971)). The standard is high, and infrequently met. As one court wrote, "[o]nly in clear-cut cases ought it to avail defendant." *Tahan,* 662 F.2d at 866 n.17 (citing von Mehren & Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach,* 81 Harv.L.Rev. 1601, 1670 (1968); Paulsen & Sovern, *"Public Policy" in the Conflict of Laws,* 56 Colum. L.Rev. 969, 980–81, 1015–16 (1956)). In the classic formulation, a judgment that "tends clearly" to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property is against public policy. *See Somportex v. Philadelphia Chewing Gum,* 453 F.2d 435, 443 (3d Cir.1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972) (quoting *Goodyear v. Brown,* 55 Pa. 514, 26 A. 665, 666 (1893)); *see also, Loucks v. Standard Oil Co.,* 224 N.Y. 99, 110, 120 N.E. 198 (1918) (Cardozo, J.) (vested rights

may be withheld when "the cause of action in its nature offends our sense of justice or menaces the public welfare").

■ The narrowness of the public policy exception to enforcement would seem to reflect an axiom fundamental to the goals of comity and res judicata that underlie the doctrine of recognition and enforcement of foreign judgments. As Judge Cardozo so lucidly observed: "We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home." *Loucks*, 224 N.Y. at 110–11. Further, the narrowness of the public policy exception indicates a jurisprudential compromise between two guiding but sometimes conflicting principles in the law of recognition and enforcement of foreign judgments: (1) res judicata, *see* Reese, *The Status in this Country of Judgments Rendered Abroad*, 50 Colum.L.Rev. 783, 797 (1950); Paulsen & Sovern, *supra*, 56 Colum.L.Rev. 969; and (2) fairness to litigants, *see* von Mehren & Patterson, *Recognition and Enforcement of Foreign Country Judgments in the United States*, 6 L.Pol'y in Int'l Bus. 37, 38 (1974), or fairness regarding the underlying transaction, *see* Ehrenzweig, Private International Law § 56, at 202–03 & n.11 (1967).

■ The question presented here involves the extent to which local public policy will permit recognition and enforcement of a foreign default judgment. Since a foreign default judgment is not more or less conclusive but "*as* conclusive an adjudication" as a contested judgment, *Somportex*, 453 F.2d at 442–43 & n. 13 (citing authority) (emphasis added), the district court quite properly afforded Levine the same opportunity to contest the enforceability of the German judgment in light of the public policy issue.[12] We disagree with dicta in *Tahan*, 662 F.2d at 867, suggesting that a defendant may not raise a public policy defense once he has defaulted in the foreign adjudication. By defaulting, a defendant ensures that a judgment will be entered against him, and assumes the risk that an irrevocable mistake of law or fact may underlie that judgment. Cf. *Clarkson v. Shaheen*, 544 F.2d 624 (2d Cir.1976); *Ingenohl v. Walter E. Olsen & Co.*, 273 U.S. 541, 544, 47 S.Ct. 451, 452, 71 L.Ed. 762 (1927); *Hilton v. Guyot*, 159 U.S. 113, 203, 16 S.Ct. 139, 158, 40 L.Ed. 95 (1895) (mere mistake of law or fact will not render judgment unenforceable). We see no reason to further penalize such a defendant, or to forsake the legitimate public policy interests of the state in which enforcement is sought.

■ However, we believe that the district court erred in holding that the failure of German law regarding attorneys fees to meet our more rigorous principles of fiduciary duties sufficiently offended local public policy as to justify nonenforcement of the entire judgment, and thus total vitiation of the values of comity and res judicata that enforcement would promote. We so hold in light of the consistency with which *stare decisis* has followed Judge Cardozo's maxim, *Loucks*, 224 N.Y. at 110–11, 120 N.E. 198, that mere variance with local public policy is not sufficient to decline enforcement.

■ The narrow public policy exception to enforcement is not met merely because Ackermann did not inform Levine of the BRAGO billing statute. See *Compania Mexicana Rediodifusora Franteriza v. Spann*, 41 F.Supp. 907 (N.D.Tex.1941),

12. Under the Uniform Foreign Judgments Recognition Act, 13 U.L.A. 417 (1980), which New York has adopted, *see* N.Y.C.P.L.R. §§ 5301–5309 (McKinney's 1986), a plaintiff seeking enforcement of a foreign country judgment granting or denying recovery of a sum of money must establish *prima facie:* (1) a final judgment, conclusive and enforceable where rendered; (2) subject matter jurisdiction; (3) jurisdiction over the parties or the *res;* and (4) regular proceedings conducted under a system that provides impartial tribunals and procedures compatible with due process. These requirements approximate those required at common law. *See, e.g., Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895); *see also* Bishop & Burnette, *United States Practice Concerning the Recognition of Foreign Judgments*, 16 Int'l L. 425, 429–32 (1982). A defendant may then raise, e.g., fraud and public policy. *See* Bishop & Burnette, *supra*, at 434–37.

*aff'd. sub nom, Spann v. Compania Mexicana Radiodifusora Fronteriza,* 131 F.2d 609 (5th Cir.1942) (exception not met where a foreign attorney had failed to apprise his American client of Mexico's rule that a losing plaintiff's liability for costs is proportionate to the amount of relief originally sought). Nor is the exception met in the event that Ackermann's bill should exceed the amount which American lawyers might reasonably have charged. *See Somportex,* 453 F.2d at 443 (exception not met where a British default judgment of $94,000 against an American defendant to a contract action included in substantial part damages for loss of good will and for attorneys fees and other costs, none of which would be awarded by Pennsylvania, the state in which enforcement was granted). Certainly it is not enough merely that Germany provides a billing scheme by statute rather than by contractual arrangements subject to an attorney's fiduciary duties. We note that even New York policy permits statute-based billing systems in certain instances. *See, e.g., In re Anninger's Estate,* 35 Misc.2d 493, 230 N.Y.S.2d 910 (Sup.Ct., N.Y.Co.1962) (approving fee of 10% of net recovery from Foreign Claims Settlement Commission, even if there had been no agreement on the fee, where statute so provided); *cf. Compania Mexicana,* 41 F.Supp. at 909, *aff'd.,* 131 F.2d 609 (federal court noting federal and state statutes providing for recovery of attorneys fees). Nor can we say that the German judgment is unenforceable because the attorney-client relationship herein was not structured commensurate with the New York policy favoring, though not requiring, written retainer agreements. It is not enough merely that a foreign judgment fails to fulfill domestic practice or policy. *See Tahan,* 662 F.2d at 867 & n.20 (general rule against compelling losing side in litigation to pay attorneys fees of the winning side) (citing *Somportex,* 453 F.2d at 443).[13]

We hold that the public policy that charges an American lawyer with ensuring fair and reasonable compensation, fully disclosed to and understood by the client, does not warrant nonenforcement of the German judgment, given that there was no finding of "fraud, overreaching or bad faith" on the part of Ackermann, the foreign lawyer, *cf. Spann,* 131 F.2d at 611, and that Levine, the American client, was a sophisticated business person with access to competent American international legal counsel. *Compare In re Schanzer's Estate,* 7 A.D.2d 275, 182 N.Y.S.2d 475, 477–79 (1st Dep't (1959), *aff'd.,* 8 N.Y.2d 972, 204 N.Y.S.2d 349, 169 N.E. 11 (1960) (attorney breaches retainer agreement with "somewhat illiterate" client). Germany's choice to regulate attorneys fees by statute rather than by fiduciary principles, and to vest the Regional Courts with jurisdiction to ensure the proper application of the BRAGO statute, did not lead to treatment of Levine that could be considered so "repugnant to fundamental notions of what is decent and just," *Tahan,* 662 F.2d at 864, as to warrant nonenforcement of the default judgment in its entirety.

▪ Thus, we think that the district court erred in holding the judgment unenforceable as offensive to New York's public policy that lawyers discharge their fiduciary duty to ensure fair and reasonable fees, fully disclosed to and understood by their clients. However, that this broad, fiduciary-based public policy does not render the judgment unenforceable does not preclude the possibility that a narrower, evidentiary-based public policy might render the judgment unenforceable.

▪ We hold that the applicable theory of public policy requires that recovery of attorneys fees be predicated on evidence of, at a minimum, (1) the existence of some

**13.** Indeed, in some cases a foreign judgment may be enforceable even though the underlying cause of action does not exist in the state of enforcement, *see Neporany v. Kir,* 5 A.D.2d 438, 173 N.Y.S.2d 146, *appeal dismissed,* 7 A.D.2d 836, 184 N.Y.S.2d 559 (1st Dep't 1959) (action

for seduction and criminal conversion), or itself offends the public policy of the state of enforcement, *see, Intercontinential Hotels v. Golden,* 15 N.Y.2d 9, 254 N.Y.S.2d 527, 203 N.E.2d 210 (1964) (action to recover gambling debts).

authorization by the client for the attorney to perform the work allegedly performed, *see, e.g., Knapp v. McFarland*, 457 F.2d 881, 886, 888–89 (2d Cir.), *cert. denied*, 409 U.S. 850, 93 S.Ct. 59, 34 L.Ed.2d 92 (1972) (construing New York law); *Matter of Loomis*, 273 N.Y. 76, 6 N.E.2d 103 (1937); *Matter of Linder's Estate*, 17 A.D.2d 949, 234 N.Y.S.2d 53 (2d Dep't 1962); and (2) the very existence of that work, *see, e.g., Newman v. Silver*, 553 F.Supp. 485, 497 (S.D.N.Y.1982), *modified on other grounds*, 713 F.2d 14 (2d Cir.1983) (construing New York law). These evidentiary predicates, we hold, constitute the *sine qua non* of a client's liability for legal fees. Without these predicates, there is a grave risk that American courts could become the means of enforcing unconscionable attorney fee awards, thereby endangering "public confidence" in the administration of the law and a "sense of security for individual rights ... of private property." *Somportex*, 453 F.2d at 443. Further, to foresake this fundamental public policy would impose upon American citizens doing business abroad an undue risk in dealing with foreign counsel—a result that, ironically, could undermine the very processes of transnational legal relations that the doctrines of comity and res judicata seek to promote. Where these predicates are evidenced, the defendant will not be heard to argue that the more stringent fiduciary requirements of New York's public policy regarding disclosure, reasonableness and the like should displace our concern for comity and res judicata in enforcing the German judgment. *Cf. Clarkson*, 544 F.2d at 632 ("it would contravene the public policy of New York and the doctrine of comity not to recognize the Canadian judgment").

In applying this evidentiary-based public policy, we note that courts are not limited to recognizing a judgment entirely or not at all. Where a foreign judgment contains discrete components, the enforcing court should endeavor to discern the appropriate "extent of recognition," *cf.* 18 C. Wright & A. Miller, Federal Practice and Procedure § 4473, at 745 (1981), with reference to applicable public policy concerns.

Ackermann has laid the predicate in support of his bill for "detailed discussions with prospective buyers" and for the related travel and office expenses, but he has not done so for the "basic fee for the study of the project files, [and] discussion with client and his counsel." As for the discussions and related expenses, there was evidence of authorization in Levine's letter to Ackermann of June 8, 1979 and his telephone response to Ackermann's telex of June 14, 1979, confirming authorization as to the second bank.[14] There was undisputed evidence that Ackermann did negotiate with representatives from the two banks in West Berlin and Frankfurt.

Recognition of the foreign judgment to this extent is consonant with the evidence that Levine engaged Ackermann's services and benefited therefrom. Although it was not Levine who brought suit in Germany, he did invoke the law of that nation by seeking counsel with a view toward negotiating a contract with German investors. Levine clearly would have benefited from German law had his work with Ackermann proved fruitful. *Cf. Compania Mexicana*, 41 F.Supp. at 908 (American client "went to Mexico and chose his own attorney and entered into a written power-of-attorney with him" before foreign counsel brought action on his behalf). He thus "finds himself in the quite unenviable posi-

---

**14.** We recognize that the district judge found that Levine "believed that Mr. Ackermann was acting in the capacity of a broker." Op. at 647. However, Levine specifically requested or assented to Ackermann's discussions with prospective buyers, for which Ackermann is recovering herein. In this sense, Levine authorized the performance of this work, and it is irrelevant to this issue whether Levine so authorized while believing that Ackermann would be acting as a lawyer or a broker. Further, both Acker-

mann's billing letter to Levine and the complaint in the German court unambiguously stated that Ackermann was seeking *legal fees* for these services. Thus, well before the German default judgment was entered, Levine knew or should have known that the subject dispute involved legal fees. If Levine believed that Ackermann had been acting as a broker, he should have so argued in the German lawsuit; he did not do so, and accordingly may not raise this issue in the enforcement proceeding.

tion of trying to take the good without the bad, the sweet without the bitter." *Spann*, 131 F.2d at 611.

As to the fifteen to twenty days of work that comprise the bulk of the "basic fee for study of the project files," the record reflects no evidence of an authorization to do such work or of the existence of any work product. The mere fact that Ackermann possessed the project files is inconsequential since Levine did not know that Bauer had given those files to Ackermann. Nor do we find authorization in the office visit of late May or early June, 1978, since the district court found that visit had accomplished only the creation of a misunderstanding. Even if there had been an authorization, there was not a scintilla of evidence of work product. Ackermann offered no client memoranda, no memoranda to his files, no handwritten notes, no markings on the papers that Bauer had given him, and no other indicia of actual performance. Indeed, when his deposition was taken, Ackermann conceded that he prepared no formal memoranda and that he did not believe that there was any work product whatsoever in his files. We do not challenge the district court's finding as to Ackermann's character. However, we need not say that an attorney acted fraudulently or dishonestly to hold, as we do here, that the failure to adduce any evidence of work product requires disallowance of claimed legal fees. *Newman v. Silver*, 553 F.Supp. at 497, *modified on other grounds*, 713 F.2d 14 (1983).[15]

## · IV. CONCLUSION

This case involved an unfortunate disagreement between parties of different countries and legal cultures. As the district court found, both parties behaved honorably, and their dispute was born of mutual mistake. Although the defendant chose to default in a German action commenced by valid service of process, he did not thereby waive his right to contest the enforceability of the foreign judgment on grounds of public policy. The increasing internationalization of commerce requires "that American courts recognize and respect the judgments entered by foreign courts to the greatest extent consistent with our own ideals of justice and fair play." *Tahan*, 662 F.2d at 868. In light of that important imperative, we hold the German judgment to be enforceable in all respects except for the first item of DM 89.347,50 for the "[b]asic fee for the study of project files, discussion with client and his counsel," for which there was no evidence of authorization or of work product. The judgment of the district court is accordingly, affirmed in part and reversed in part, and the cause is remanded to the district court for entry of an order not inconsistent with this opinion.[16]

*Affirmed in part and reversed in part.*

---

15. That portion of the fee that reflects the initial consultation is also untenable. First, Ackermann provides no mechanism by which this court could separate this de minimis aspect of the "basic fee" from the fifteen to twenty days of subsequent work. Second, we again can discern no evidence in the record of an authorization to consult for payment.

16. Since the district court did not reach the issues of interest and exchange rates in its opinion, we leave those issues for the district judge to resolve on remand.